[No. S103781. June 30, 2003.]

INTEL CORPORATION, Plaintiff and Respondent, v.
KOUROSH KENNETH HAMIDI, Defendant and Appellant.

1344

## COUNSEL

Philip H. Weber; Dechert, William M. McSwain, Richard L. Berkman, F. Gregory Lastowka; Levy, Ram & Olson, Karl Olson and Erica L. Craven for Defendant and Appellant.

Mark A. Lemley and Deirdre K. Mulligan for Professors of Intellectual Property and Computer Law as Amicus Curiae on behalf of Defendant and Appellant.

Lee Tien and Deborah Pierce for Electronic Frontier Foundation as Amicus Curiae on behalf of Defendant and Appellant.

Jennifer Stisa Granick for the Stanford Law School Center for Internet and Society as Amicus Curiae on behalf of Defendant and Appellant.

Ann Brick and Christopher A. Hansen for American Civil Liberties Union Foundation of Northern California, Inc., and American Civil Liberties Union Foundation as Amici Curiae on behalf of Defendant and Appellant.

Robert M. O'Neil and J. Joshua Wheeler for The Thomas Jefferson Center for the Protection of Free Expression as Amicus Curiae on behalf of Defendant and Appellant.

Atshuler, Berzon, Nussbaum, Rubin & Demain, Stephen P. Berzon, Scott A. Kronland and Stacey M. Leyton for the Service Employees International Union, AFL-CIO as Amicus Curiae on behalf of Defendant and Appellant.

Morrison & Foerster, Linda E. Shostak, Michael A. Jacobs, Kurt E. Springmann and Paul A. Friedman for Plaintiff and Respondent.

Steptoe & Johnson, Stewart A. Baker and W. Chelsea Chen for the US Internet Service Provider Association as Amicus Curiae on behalf of Plaintiff and Respondent.

Richard A. Epstein for California Employment Law Council, California Manufacturers & Technology Association, eBay, Inc., Information Technology Industry Council, National Association of Manufacturers, Semiconductor Industry Association and Silicon Valley Manufacturing Group as Amici Curiae on behalf of Plaintiff and Respondent.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Plaintiff and Respondent.

Proskauer Rose, Mark Theodore, Arthur F. Silbergeld, Niloofar Nejat-Bina and Adam C. Abrahms for Labor Policy Association, Inc., United States Chamber of Commerce and California Chamber of Commerce as Amici Curiae on behalf of Plaintiff and Respondent.

---

## OPINION

**WERDEGAR, J.**—Intel Corporation (Intel) maintains an electronic mail system, connected to the Internet, through which messages between employees and those outside the company can be sent and received, and permits its employees to make reasonable nonbusiness use of this system. On six occasions over almost two years, Kourosh Kenneth Hamidi, a former Intel employee, sent e-mails criticizing Intel's employment practices to numerous current employees on Intel's electronic mail system. Hamidi breached no computer security barriers in order to communicate with Intel employees. He offered to, and did, remove from his mailing list any recipient who so wished. Hamidi's communications to individual Intel employees caused neither physical damage nor functional disruption to the company's computers, nor did they at any time deprive Intel of the use of its computers. The contents of the messages, however, caused discussion among employees and managers.

On these facts, Intel brought suit, claiming that by communicating with its employees over the company's e-mail system Hamidi committed the tort of

trespass to chattels. The trial court granted Intel's motion for summary judgment and enjoined Hamidi from any further mailings. A divided Court of Appeal affirmed.

After reviewing the decisions analyzing unauthorized electronic contact with computer systems as potential trespasses to chattels, we conclude that under California law the tort does not encompass, and should not be extended to encompass, an electronic communication that neither damages the recipient computer system nor impairs its functioning. Such an electronic communication does not constitute an actionable trespass to personal property, i.e., the computer system, because it does not interfere with the possessor's use or possession of, or any other legally protected interest in, the personal property itself. (See *Zaslow v. Kroenert* (1946) 29 Cal.2d 541, 551 [176 P.2d 1]; *Ticketmaster Corp. v. Tickets.com, Inc.* (C.D.Cal., Aug. 10, 2000, No. 99CV7654) 2000 WL 1887522, p. *4; Rest.2d Torts, § 218.) The consequential economic damage Intel claims to have suffered, i.e., loss of productivity caused by employees reading and reacting to Hamidi's messages and company efforts to block the messages, is not an injury to the company's interest in its computers—which worked as intended and were unharmed by the communications—any more than the personal distress caused by reading an unpleasant letter would be an injury to the recipient's mailbox, or the loss of privacy caused by an intrusive telephone call would be an injury to the recipient's telephone equipment.

Our conclusion does not rest on any special immunity for communications by electronic mail; we do not hold that messages transmitted through the Internet are exempt from the ordinary rules of tort liability. To the contrary, e-mail, like other forms of communication, may in some circumstances cause legally cognizable injury to the recipient or to third parties and may be actionable under various common law or statutory theories. Indeed, on facts somewhat similar to those here, a company or its employees might be able to plead causes of action for interference with prospective economic relations (see *Guillory v. Godfrey* (1955) 134 Cal.App.2d 628, 630-632 [286 P.2d 474] [defendant berated customers and prospective customers of plaintiffs' cafe with disparaging and racist comments]), interference with contract (see *Blender v. Superior Court* (1942) 55 Cal.App.2d 24, 25-27 [130 P.2d 179] [defendant made false statements about plaintiff to his employer, resulting in plaintiff's discharge]) or intentional infliction of emotional distress (see *Kisesky v. Carpenters' Trust for So. California* (1983) 144 Cal.App.3d 222, 229-230 [192 Cal.Rptr. 492] [agents of defendant union threatened life, health, and family of employer if he did not sign agreement with union].) And, of course, as with any other means of publication, third party subjects of e-mail communications may under appropriate facts make claims for

defamation, publication of private facts, or other speech-based torts. (See, e.g., *Southridge Capital Management v. Lowry* (S.D.N.Y. 2002) 188 F.Supp.2d 388, 394-396 [allegedly false statements in e-mail sent to several of plaintiff's clients support actions for defamation and interference with contract].) Intel's claim fails not because e-mail transmitted through the Internet enjoys unique immunity, but because the trespass to chattels tort— unlike the causes of action just mentioned—may not, in California, be proved without evidence of an injury to the plaintiff's personal property or legal interest therein.

Nor does our holding affect the legal remedies of Internet service providers (ISP's) against senders of unsolicited commercial bulk e-mail (UCE), also known as "spam." (See *Ferguson v. Friendfinders, Inc.* (2002) 94 Cal.App.4th 1255, 1267 [115 Cal.Rptr.2d 258].) A series of federal district court decisions, beginning with *CompuServe Inc. v. Cyber Promotions, Inc.* (S.D.Ohio 1997) 962 F.Supp. 1015, has approved the use of trespass to chattels as a theory of spammers' liability to ISP's, based upon evidence that the vast quantities of mail sent by spammers both overburdened the ISP's own computers and made the entire computer system harder to use for recipients, the ISP's customers. (See *id.* at pp. 1022-1023.) In those cases, discussed in greater detail below, the underlying complaint was that the extraordinary *quantity* of UCE impaired the computer system's functioning. In the present case, the claimed injury is located in the disruption or distraction caused to recipients by the *contents* of the e-mail messages, an injury entirely separate from, and not directly affecting, the possession or value of personal property.

### FACTUAL AND PROCEDURAL BACKGROUND

We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. (*Galanty v. Paul Revere Life Ins. Co.* (2000) 23 Cal.4th 368, 374 [97 Cal.Rptr.2d 67, 1 P.3d 658]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 404 [87 Cal.Rptr.2d 453, 981 P.2d 79]; Code Civ. Proc., § 437c, subd. (c).) The pertinent undisputed facts are as follows.

Hamidi, a former Intel engineer, together with others, formed an organization named Former and Current Employees of Intel (FACE-Intel) to disseminate information and views critical of Intel's employment and personnel policies and practices. FACE-Intel maintained a Web site (which identified Hamidi as Webmaster and as the organization's spokesperson) containing such material. In addition, over a 21-month period Hamidi, on

behalf of FACE-Intel, sent six mass e-mails to employee addresses on Intel's electronic mail system. The messages criticized Intel's employment practices, warned employees of the dangers those practices posed to their careers, suggested employees consider moving to other companies, solicited employees' participation in FACE-Intel, and urged employees to inform themselves further by visiting FACE-Intel's Web site. The messages stated that recipients could, by notifying the sender of their wishes, be removed from FACE-Intel's mailing list; Hamidi did not subsequently send messages to anyone who requested removal.

Each message was sent to thousands of addresses (as many as 35,000 according to FACE-Intel's Web site), though some messages were blocked by Intel before reaching employees. Intel's attempt to block internal transmission of the messages succeeded only in part; Hamidi later admitted he evaded blocking efforts by using different sending computers. When Intel, in March 1998, demanded in writing that Hamidi and FACE-Intel stop sending e-mails to Intel's computer system, Hamidi asserted the organization had a right to communicate with willing Intel employees; he sent a new mass mailing in September 1998.

The summary judgment record contains no evidence Hamidi breached Intel's computer security in order to obtain the recipient addresses for his messages; indeed, internal Intel memoranda show the company's management concluded no security breach had occurred.[1] Hamidi stated he created the recipient address list using an Intel directory on a floppy disk anonymously sent to him. Nor is there any evidence that the receipt or internal distribution of Hamidi's electronic messages damaged Intel's computer system or slowed or impaired its functioning. Intel did present uncontradicted evidence, however, that many employee recipients asked a company official to stop the messages and that staff time was consumed in attempts to block further messages from FACE-Intel. According to the FACE-Intel Web site, moreover, the messages had prompted discussions between "[e]xcited and nervous managers" and the company's human resources department.

Intel sued Hamidi and FACE-Intel, pleading causes of action for trespass to chattels and nuisance, and seeking both actual damages and an injunction

[1] To the extent, therefore, that Justice Mosk suggests Hamidi breached the security of Intel's internal computer network by "circumvent[ing]" Intel's "security measures" and entering the company's "intranet" (dis. opn. of Mosk, J., *post*, at p. 1386), the evidence does not support such an implication. An "intranet" is "a network based on TCP/IP protocols (an internet) belonging to an organization, usually a corporation, accessible only by the organization's members, employees, or others with authorization." (<http://www.webopedia.com/TERM/i/intranet.html> [as of June 30, 2003].) Hamidi used only a part of Intel's computer network accessible to outsiders.

against further e-mail messages. Intel later voluntarily dismissed its nuisance claim and waived its demand for damages. The trial court entered default against FACE-Intel upon that organization's failure to answer. The court then granted Intel's motion for summary judgment, permanently enjoining Hamidi, FACE-Intel, and their agents "from sending unsolicited e-mail to addresses on Intel's computer systems." Hamidi appealed; FACE-Intel did not.[2]

The Court of Appeal, with one justice dissenting, affirmed the grant of injunctive relief. The majority took the view that the use of or intermeddling with another's personal property is actionable as a trespass to chattels without proof of any actual injury to the personal property; even if Intel could not show any damages resulting from Hamidi's sending of messages, "it showed he was disrupting its business by using its property and therefore is entitled to injunctive relief based on a theory of trespass to chattels." The dissenting justice warned that the majority's application of the trespass to chattels tort to "unsolicited electronic mail that causes no harm to the private computer system that receives it" would "expand the tort of trespass to chattel in untold ways and to unanticipated circumstances."

We granted Hamidi's petition for review.[3]

## DISCUSSION

### I. Current California Tort Law

■ Dubbed by Prosser the "little brother of conversion," the tort of trespass to chattels allows recovery for interferences with possession of personal property "not sufficiently important to be classed as conversion, and so to compel the defendant to pay the full value of the thing with which he has interfered." (Prosser & Keeton, Torts (5th ed. 1984) § 14, pp. 85-86.)

Though not amounting to conversion, the defendant's interference must, to be actionable, have caused some injury to the chattel or to the plaintiff's rights in it. Under California law, trespass to chattels "lies where an intentional interference with the possession of personal property *has proximately*

---

[2]For the first time, in this court, Intel argues Hamidi's appeal is moot because, as FACE-Intel's agent, Hamidi is bound, whatever the outcome of his own appeal, by the unappealed injunction against FACE-Intel. But as Hamidi points out in response, he could avoid the unappealed injunction simply by resigning from FACE-Intel; his own appeal is therefore not moot.

[3]We grant both parties' requests for notice of legislative history materials relating to California laws on spam and on injunctions in labor dispute cases. Hamidi's further request for notice of the "undisputed" fact that "e-mail messages that travel into computer equipment consist of electromagnetic waves" is denied as irrelevant.

*caused injury." (Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566 [54 Cal.Rptr.2d 468], italics added.) In cases of interference with possession of personal property not amounting to conversion, "the owner has a cause of action for trespass or case, *and may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use." (Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551, italics added; accord, *Jordan v. Talbot* (1961) 55 Cal.2d 597, 610 [12 Cal.Rptr. 488, 361 P.2d 20, 6 A.L.R.3d 161].) In modern American law generally, "[t]respass remains as an occasional remedy for minor interferences, *resulting in some damage,* but not sufficiently serious or sufficiently important to amount to the greater tort" of conversion. (Prosser & Keeton, Torts, *supra,* § 15, p. 90, italics added.)

The Restatement, too, makes clear that some actual injury must have occurred in order for a trespass to chattels to be actionable. Under section 218 of the Restatement Second of Torts, dispossession alone, without further damages, is actionable (see *id.,* par. (a) & com. d, pp. 420-421), but other forms of interference require some additional harm to the personal property or the possessor's interests in it. (*Id.,* pars. (b)-(d).) "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. *Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected as stated in Clause (c).* Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference." (*Id.,* com. e, pp. 421-422, italics added.)

The Court of Appeal (quoting 7 Speiser et al., American Law of Torts (1990) Trespass, § 23:23, p. 667) referred to " 'a number of very early cases [showing that] any unlawful interference, however slight, with the enjoyment by another of his personal property, is a trespass.' " But while a harmless use or touching of personal property may be a technical trespass (see Rest.2d Torts, § 217), an interference (not amounting to dispossession) is not *actionable,* under modern California and broader American law, without a showing of harm. As already discussed, this is the rule embodied in the Restatement (Rest.2d Torts, § 218) and adopted by California law

(*Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551; *Thrifty-Tel, Inc. v. Bezenek, supra,* 46 Cal.App.4th at p. 1566).

In this respect, as Prosser explains, modern day trespass to chattels differs both from the original English writ and from the action for trespass to land: "Another departure from the original rule of the old writ of trespass concerns the necessity of some actual damage to the chattel before the action can be maintained. Where the defendant merely interferes without doing any harm—as where, for example, he merely lays hands upon the plaintiff's horse, or sits in his car—there has been a division of opinion among the writers, and a surprising dearth of authority. *By analogy to trespass to land there might be a technical tort in such a case . . . . Such scanty authority as there is, however, has considered that the dignitary interest in the inviolability of chattels, unlike that as to land, is not sufficiently important to require any greater defense than the privilege of using reasonable force when necessary to protect them. Accordingly it has been held that nominal damages will not be awarded, and that in the absence of any actual damage the action will not lie.*" (Prosser & Keeton, Torts, *supra,* § 14, p. 87, italics added, fns. omitted.)

Intel suggests that the requirement of actual harm does not apply here because it sought only injunctive relief, as protection from future injuries. But as Justice Kolkey, dissenting below, observed, "[t]he fact the relief sought is injunctive does not excuse a showing of injury, whether actual or threatened." Indeed, in order to obtain injunctive relief the plaintiff must ordinarily show that the defendant's wrongful acts threaten to cause *irreparable* injuries, ones that cannot be adequately compensated in damages. (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 782, p. 239.) ██ Even in an action for trespass to real property, in which damage to the property is not an element of the cause of action, "the extraordinary remedy of injunction" cannot be invoked without showing the likelihood of irreparable harm. (*Mechanics' Foundry v. Ryall* (1888) 75 Cal. 601, 603 [17 P. 703]; see *Mendelson v. McCabe* (1904) 144 Cal. 230, 232-233 [77 P. 915] [injunction against trespass to land proper where continued trespasses threaten creation of prescriptive right and repetitive suits for damages would be inadequate remedy].) ██ A fortiori, to issue an injunction without a showing of likely irreparable injury in an action for trespass to chattels, in which injury to the personal property or the possessor's interest in it *is* an element of the action, would make little legal sense.

The dispositive issue in this case, therefore, is whether the undisputed facts demonstrate Hamidi's actions caused or threatened to cause damage to Intel's computer system, or injury to its rights in that personal property, such as to entitle Intel to judgment as a matter of law. To review, the undisputed

evidence revealed no actual or threatened damage to Intel's computer hardware or software and no interference with its ordinary and intended operation. Intel was not dispossessed of its computers, nor did Hamidi's messages prevent Intel from using its computers for any measurable length of time. Intel presented no evidence its system was slowed or otherwise impaired by the burden of delivering Hamidi's electronic messages. Nor was there any evidence transmission of the messages imposed any marginal cost on the operation of Intel's computers. In sum, no evidence suggested that in sending messages through Intel's Internet connections and internal computer system Hamidi used the system in any manner in which it was not intended to function or impaired the system in any way. Nor does the evidence show the request of any employee to be removed from FACE-Intel's mailing list was not honored. The evidence did show, however, that some employees who found the messages unwelcome asked management to stop them and that Intel technical staff spent time and effort attempting to block the messages. A statement on the FACE-Intel Web site, moreover, could be taken as an admission that the messages had caused "[e]xcited and nervous managers" to discuss the matter with Intel's human resources department.

Relying on a line of decisions, most from federal district courts, applying the tort of trespass to chattels to various types of unwanted electronic contact between computers, Intel contends that, while its computers were not damaged by receiving Hamidi's messages, its interest in the "physical condition, quality or value" (Rest.2d Torts, § 218, com. e, p. 422) of the computers was harmed. We disagree. The cited line of decisions does not persuade us that the mere sending of electronic communications that assertedly cause injury only because of their contents constitutes an actionable trespass to a computer system through which the messages are transmitted. Rather, the decisions finding electronic contact to be a trespass to computer systems have generally involved some actual or threatened interference with the computers' functioning.

In *Thrifty-Tel, Inc. v. Bezenek, supra*, 46 Cal.App.4th at pages 1566-1567 (*Thrifty-Tel*), the California Court of Appeal held that evidence of automated searching of a telephone carrier's system for authorization codes supported a cause of action for trespass to chattels. The defendant's automated dialing program "overburdened the [plaintiff's] system, denying some subscribers access to phone lines" (*id.* at p. 1564), showing the requisite injury.

Following *Thrifty-Tel*, a series of federal district court decisions held that sending UCE through an ISP's equipment may constitute trespass to the ISP's computer system. The lead case, *CompuServe Inc. v. Cyber Promotions, Inc., supra*, 962 F.Supp. 1015, 1021-1023 (*CompuServe*), was followed

by *Hotmail Corp. v. Van$ Money Pie, Inc.* (N.D.Cal., Apr. 16, 1998, No. C 98-20064 JW) 1998 WL 388389, page *7, *America Online, Inc. v. IMS* (E.D.Va. 1998) 24 F.Supp.2d 548, 550-551, and *America Online, Inc. v. LCGM, Inc.* (E.D.Va. 1998) 46 F.Supp.2d 444, 451-452.

In each of these spamming cases, the plaintiff showed, or was prepared to show, some interference with the efficient functioning of its computer system. In *CompuServe*, the plaintiff ISP's mail equipment monitor stated that mass UCE mailings, especially from nonexistent addresses such as those used by the defendant, placed "a tremendous burden" on the ISP's equipment, using "disk space and drain[ing] the processing power," making those resources unavailable to serve subscribers. (*CompuServe, supra*, 962 F.Supp. at p. 1022.) Similarly, in *Hotmail Corp. v. Van$ Money Pie, Inc., supra*, 1998 WL 388389 at page *7, the court found the evidence supported a finding that the defendant's mailings "fill[ed] up Hotmail's computer storage space and threaten[ed] to damage Hotmail's ability to service its legitimate customers." *America Online, Inc. v. IMS*, decided on summary judgment, was deemed factually indistinguishable from *CompuServe*; the court observed that in both cases the plaintiffs "alleged that processing the bulk e-mail cost them time and money and burdened their equipment." (*America Online, Inc. v. IMS, supra*, 24 F.Supp.2d at p. 550.) The same court, in *America Online, Inc. v. LCGM, Inc., supra*, 46 F.Supp.2d at page 452, simply followed *CompuServe* and its earlier *America Online* decision, quoting the former's explanation that UCE burdened the computer's processing power and memory.

Building on the spamming cases, in particular *CompuServe*, three even more recent district court decisions addressed whether unauthorized robotic data collection[4] from a company's publicly accessible Web site is a trespass on the company's computer system. (*eBay, Inc. v. Bidder's Edge, Inc., supra*, 100 F.Supp.2d at pp. 1069-1072 (*eBay*); *Register.com, Inc. v. Verio, Inc.* (S.D.N.Y. 2000) 126 F.Supp.2d 238, 248-251; *Ticketmaster Corp. v. Tickets.com, Inc., supra*, 2000 WL 1887522 at p. *4.) The two district courts that found such automated data collection to constitute a trespass relied, in part, on the deleterious impact this activity could have, especially if replicated by other searchers, on the functioning of a Web site's computer equipment.

In the leading case, *eBay*, the defendant Bidder's Edge (BE), operating an auction aggregation site, accessed the eBay Web site about 100,000 times

---

[4] Data search and collection robots, also known as "Web bots" or "spiders," are programs designed to rapidly search numerous Web pages or sites, collecting, retrieving, and indexing information from these pages. Their uses include creation of searchable databases, Web catalogues and comparison shopping services. (*eBay, Inc. v. Bidder's Edge, Inc.* (N.D.Cal. 2000) 100 F.Supp.2d 1058, 1060-1061; O'Rourke, *Property Rights and Competition on the Internet: In Search of an Appropriate Analogy* (2001) 16 Berkeley Tech. L.J. 561, 570-571; Quilter, *The Continuing Expansion of Cyberspace Trespass to Chattels* (2002) 17 Berkeley Tech. L.J. 421, 423-424.)

per day, accounting for between 1 and 2 percent of the information requests received by eBay and a slightly smaller percentage of the data transferred by eBay. (*eBay*, *supra*, 100 F.Supp.2d at pp. 1061, 1063.) The district court rejected eBay's claim that it was entitled to injunctive relief because of the defendant's unauthorized presence alone, or because of the incremental cost the defendant had imposed on operation of the eBay site (*id.* at pp. 1065-1066), but found sufficient proof of *threatened* harm in the potential for others to imitate the defendant's activity: "If BE's activity is allowed to continue unchecked, it would encourage other auction aggregators to engage in similar recursive searching of the eBay system such that eBay would suffer irreparable harm from reduced system performance, system unavailability, or data losses." (*Id.* at p. 1066.) Again, in addressing the likelihood of eBay's success on its trespass to chattels cause of action, the court held the evidence of injury to eBay's computer system sufficient to support a preliminary injunction: "If the court were to hold otherwise, it would likely encourage other auction aggregators to crawl the eBay site, potentially to the point of denying effective access to eBay's customers. If preliminary injunctive relief were denied, and other aggregators began to crawl the eBay site, there appears to be little doubt that the load on eBay's computer system would qualify as a substantial impairment of condition or value." (*Id.* at pp. 1071-1072.)

Another district court followed *eBay* on similar facts—a domain name registrar's claim against a Web hosting and development site that robotically searched the registrar's database of newly registered domain names in search of business leads—in *Register.com, Inc. v. Verio, Inc.*, *supra*, 126 F.Supp.2d at pages 249-251. Although the plaintiff was unable to measure the burden the defendant's searching had placed on its system (*id.* at pp. 249-250), the district court, quoting the declaration of one of the plaintiff's officers, found sufficient evidence of threatened harm to the system in the possibility the defendant's activities would be copied by others: " 'I believe that if Verio's searching of Register.com's WHOIS database were determined to be lawful, then every purveyor of Internet-based services would engage in similar conduct.' " (*Id.* at p. 250.) Like eBay, the court observed, Register.com had a legitimate fear "that its servers will be flooded by search robots." (*Id.* at p. 251.)

In the third decision discussing robotic data collection as a trespass, *Ticketmaster Corp. v. Tickets.com, Inc.*, *supra*, 2000 WL 1887522 (*Ticketmaster*), the court, distinguishing *eBay*, found *insufficient* evidence of harm to the chattel to constitute an actionable trespass: "A basic element of trespass to chattels must be physical harm to the chattel (not present here) or some obstruction of its basic function (in the court's opinion not sufficiently

shown here). . . . The comparative use [by the defendant of the plaintiff's computer system] appears very small and there is no showing that the use interferes to any extent with the regular business of [the plaintiff]. . . . *Nor here is the specter of dozens or more parasites joining the fray, the cumulative total of which could affect the operation of [the plaintiff's] business.*" (*Id.* at p. *4, italics added.)

■■■■ In the decisions so far reviewed, the defendant's use of the plaintiff's computer system was held sufficient to support an action for trespass when it actually did, or threatened to, interfere with the intended functioning of the system, as by significantly reducing its available memory and processing power. In *Ticketmaster, supra,* 2000 WL 1887522, the one case where no such effect, actual or threatened, had been demonstrated, the court found insufficient evidence of harm to support a trespass action. These decisions do not persuade us to Intel's position here, for Intel has demonstrated neither any appreciable effect on the operation of its computer system from Hamidi's messages, nor any likelihood that Hamidi's actions will be replicated by others if found not to constitute a trespass.

That Intel does not claim the type of functional impact that spammers and robots have been alleged to cause is not surprising in light of the differences between Hamidi's activities and those of a commercial enterprise that uses sheer quantity of messages as its communications strategy. Though Hamidi sent thousands of copies of the same message on six occasions over 21 months, that number is minuscule compared to the amounts of mail sent by commercial operations. The individual advertisers sued in *America Online, Inc. v. IMS, supra,* 24 F.Supp.2d at page 549, and *America Online, Inc. v. LCGM, Inc., supra,* 46 F.Supp.2d at page 448, were alleged to have sent more than 60 million messages over 10 months and more than 92 million messages over seven months, respectively. Collectively, UCE has reportedly come to constitute about 45 percent of all e-mail. (Hansell, *Internet Is Losing Ground in Battle Against Spam,* N.Y. Times (Apr. 22, 2003) p. A1, col. 3.) The functional burden on Intel's computers, or the cost in time to individual recipients, of receiving Hamidi's occasional advocacy messages cannot be compared to the burdens and costs caused ISP's and their customers by the ever-rising deluge of commercial e-mail.

Intel relies on language in the *eBay* decision suggesting that unauthorized use of another's chattel is actionable even without any showing of injury: "Even if, as [defendant] BE argues, its searches use only a small amount of eBay's computer system capacity, BE has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property." (*eBay,*

*supra,* 100 F.Supp.2d at p. 1071.) But as the *eBay* court went on immediately to find that the defendant's conduct, if widely replicated, *would* likely impair the functioning of the plaintiff's system (*id.* at pp. 1071-1072), we do not read the quoted remarks as expressing the court's complete view of the issue. In isolation, moreover, they would not be a correct statement of California or general American law on this point. While one may have no *right* temporarily to use another's personal property, such use is actionable as a trespass only if it "has proximately caused injury." (*Thrifty-Tel, supra,* 46 Cal.App.4th at p. 1566.) "[I]n the absence of any actual damage the action will not lie." (Prosser & Keeton, Torts, *supra,* § 14, p. 87.) Short of dispossession, personal injury, or physical damage (not present here), intermeddling is actionable only if "the chattel is impaired as to its condition, quality, or value, or [¶] . . . the possessor is deprived of the use of the chattel for a substantial time." (Rest.2d Torts, § 218, pars. (b), (c).) In particular, an actionable deprivation of use "must be for a time so substantial that it is possible to estimate the loss caused thereby. A mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession . . . ." (*Id.,* com. i, p. 423.) That Hamidi's messages temporarily used some portion of the Intel computers' processors or storage is, therefore, not enough; Intel must, but does not, demonstrate some measurable loss from the use of its computer system.[5]

In addition to impairment of system functionality, *CompuServe* and its progeny also refer to the ISP's loss of business reputation and customer goodwill, resulting from the inconvenience and cost that spam causes to its members, as harm to the ISP's legally protected interests in its personal property. (See *CompuServe, supra,* 962 F.Supp.2d at p. 1023; *Hotmail Corp. v. Van$ Money Pie, Inc., supra,* 1998 WL 388389 at p. *7; *America Online, Inc. v. IMS, supra,* 24 F.Supp.2d at p. 550.) Intel argues that its own interest in employee productivity, assertedly disrupted by Hamidi's messages, is a comparable protected interest in its computer system. We disagree.

[5] In the most recent decision relied upon by Intel, *Oyster Software, Inc. v. Forms Processing, Inc.* (N.D.Cal., Dec. 6, 2001, No. C-00-0724 JCS) 2001 WL 1736382, pages *12-*13, a federal magistrate judge incorrectly read *eBay* as establishing, under California law, that mere unauthorized use of another's computer system constitutes an actionable trespass. The plaintiff accused the defendant, a business competitor, of copying the metatags (code describing the contents of a Web site to a search engine) from the plaintiff's Web site, resulting in diversion of potential customers for the plaintiff's services. (*Id.* at pp. *1-*2.) With regard to the plaintiff's trespass claim (the plaintiff also pleaded causes of action for, inter alia, misappropriation, copyright and trademark infringement), the magistrate judge concluded that *eBay* imposed no requirement of actual damage and that the defendant's conduct was sufficient to establish a trespass "simply because [it] amounted to 'use' of Plaintiff's computer." (*Id.* at p. *13.) But as just explained, we do not read *eBay, supra,* 100 F.Supp.2d 1058, as holding that the actual injury requirement may be dispensed with, and such a suggestion would, in any event, be erroneous as a statement of California law.

Whether the economic injuries identified in *CompuServe* were properly considered injuries to the ISP's possessory interest in its personal property, the type of property interest the tort is primarily intended to protect (see Rest.2d Torts, § 218 & com. e, pp. 421-422; Prosser & Keeton, Torts, *supra*, § 14, p. 87), has been questioned.[6] "[T]he court broke the chain between the trespass and the harm, allowing indirect harms to CompuServe's business interests—reputation, customer goodwill, and employee time—to count as harms to the chattel (the server)." (Quilter, *The Continuing Expansion of Cyberspace Trespass to Chattels, supra,* 17 Berkeley Tech. L.J. at pp. 429-430.) "[T]his move cuts trespass to chattels free from its moorings of dispossession or the equivalent, allowing the court free reign [*sic*] to hunt for 'impairment.'" (Burk, *The Trouble with Trespass* (2000) 4 J. Small & Emerging Bus. L. 27, 35.) But even if the loss of goodwill identified in *CompuServe* were the type of injury that would give rise to a trespass to chattels claim under California law, Intel's position would not follow, for Intel's claimed injury has even less connection to its personal property than did CompuServe's.

CompuServe's customers were annoyed because the system was inundated with unsolicited commercial messages, making its use for personal communication more difficult and costly. (*CompuServe, supra,* 962 F.Supp. at p. 1023.) Their complaint, which allegedly led some to cancel their CompuServe service, was about *the functioning of CompuServe's electronic mail service.* Intel's workers, in contrast, were allegedly distracted from their work not because of the frequency or quantity of Hamidi's messages, but because of assertions and opinions the messages conveyed. Intel's complaint is thus about *the contents of the messages* rather than the functioning of the company's e-mail system. Even accepting *CompuServe's* economic injury rationale, therefore, Intel's position represents a further extension of the trespass to chattels tort, fictionally recharacterizing the allegedly injurious effect of a communication's *contents* on recipients as an impairment to the device which transmitted the message.

This theory of "impairment by content" (Burk, *The Trouble with Trespass, supra,* 4 J. Small & Emerging Bus. L. at p. 37) threatens to stretch trespass

---

[6]In support of its reasoning, the *CompuServe* court cited paragraph (d) of section 218 of the Restatement Second of Torts, which refers to harm "to some person or thing in which the possessor has a legally protected interest." As the comment to this paragraph explains, however, it is intended to cover personal injury to the possessor or another person in whom the possessor has a legal interest, or injury to "other chattel or land" in which the possessor of the chattel subject to the trespass has a legal interest. (Rest.2d Torts, § 218, com. j, p. 423.) No personal injury was claimed either in *CompuServe* or in the case at bar, and neither the lost goodwill in *CompuServe* nor the loss of employee efficiency claimed in the present case is chattel or land.

law to cover injuries far afield from the harms to possession the tort evolved to protect. Intel's theory would expand the tort of trespass to chattels to cover virtually any unconsented-to communication that, solely because of its content, is unwelcome to the recipient or intermediate transmitter. As the dissenting justice below explained, " 'Damage' of this nature—the distraction of reading or listening to an unsolicited communication—is not within the scope of the injury against which the trespass-to-chattel tort protects, and indeed trivializes it. After all, '[t]he property interest protected by the old action of trespass was that of possession; and this has continued to affect the character of the action.' (Prosser & Keeton on Torts, *supra,* § 14, p. 87.) Reading an e-mail transmitted to equipment designed to receive it, in and of itself, does not affect the possessory interest in the equipment. [¶] Indeed, if a chattel's receipt of an electronic communication constitutes a trespass to that chattel, then not only are unsolicited telephone calls and faxes trespasses to chattel, but unwelcome radio waves and television signals also constitute a trespass to chattel every time the viewer inadvertently sees or hears the unwanted program." We agree. While unwelcome communications, electronic or otherwise, can cause a variety of injuries to economic relations, reputation and emotions, those interests are protected by other branches of tort law; in order to address them, we need not create a fiction of injury to the communication system.

Nor may Intel appropriately assert a *property* interest in its employees' time. "The Restatement test clearly speaks in the first instance to the impairment of the chattel. . . . But employees are not chattels (at least not in the legal sense of the term)." (Burk, *The Trouble with Trespass, supra,* 4 J. Small & Emerging Bus. L. at p. 36.) Whatever interest Intel may have in preventing its employees from receiving disruptive communications, it is not an interest in personal property, and trespass to chattels is therefore not an action that will lie to protect it. Nor, finally, can the fact Intel staff spent time attempting to block Hamidi's messages be bootstrapped into an injury to Intel's possessory interest in its computers. To quote, again, from the dissenting opinion in the Court of Appeal: "[I]t is circular to premise the damage element of a tort solely upon the steps taken to prevent the damage. Injury can only be established by the completed tort's consequences, not by the cost of the steps taken to avoid the injury and prevent the tort; otherwise, we can create injury for every supposed tort."

Intel connected its e-mail system to the Internet and permitted its employees to make use of this connection both for business and, to a reasonable extent, for their own purposes. In doing so, the company necessarily contemplated the employees' receipt of unsolicited as well as solicited communications from other companies and individuals. That some communications

would, because of their contents, be unwelcome to Intel management was virtually inevitable. Hamidi did nothing but use the e-mail system for its intended purpose—to communicate with employees. The system worked as designed, delivering the messages without any physical or functional harm or disruption. These occasional transmissions cannot reasonably be viewed as impairing the quality or value of Intel's computer system. We conclude, therefore, that Intel has not presented undisputed facts demonstrating an injury to its personal property, or to its legal interest in that property, that support, under California tort law, an action for trespass to chattels.

## II. *Proposed Extension of California Tort Law*

We next consider whether California common law should be *extended* to cover, as a trespass to chattels, an otherwise harmless electronic communication whose contents are objectionable. We decline to so expand California law. Intel, of course, was not the recipient of Hamidi's messages, but rather the owner and possessor of computer servers used to relay the messages, and it bases this tort action on that ownership and possession. The property rule proposed is a rigid one, under which the sender of an electronic message would be strictly liable to the owner of equipment through which the communication passes—here, Intel—for any consequential injury flowing from the *contents* of the communication. The arguments of amici curiae and academic writers on this topic, discussed below, leave us highly doubtful whether creation of such a rigid property rule would be wise.

Writing on behalf of several industry groups appearing as amici curiae, Professor Richard A. Epstein of the University of Chicago urges us to excuse the required showing of injury to personal property in cases of unauthorized electronic contact between computers, "extending the rules of trespass to real property to all interactive Web sites and servers." The court is thus urged to recognize, for owners of a particular species of personal property, computer servers, the same interest in inviolability as is generally accorded a possessor of land. In effect, Professor Epstein suggests that a company's server should be its castle, upon which any unauthorized intrusion, however harmless, is a trespass.

Epstein's argument derives, in part, from the familiar metaphor of the Internet as a physical space, reflected in much of the language that has been used to describe it: "cyberspace," "the information superhighway," e-mail "addresses," and the like. Of course, the Internet is also frequently called simply the "Net," a term, Hamidi points out, "evoking a fisherman's chattel." A major component of the Internet is the World Wide "Web," a

descriptive term suggesting neither personal nor real property, and "cyber-space" itself has come to be known by the oxymoronic phrase "virtual reality," which would suggest that any real property "located" in "cyber-space" must be "virtually real" property. Metaphor is a two-edged sword.

Indeed, the metaphorical application of real property rules would not, by itself, transform a physically harmless electronic intrusion on a computer server into a trespass. ■ That is because, under California law, intan-gible intrusions on land, including electromagnetic transmissions, are not actionable as trespasses (though they may be as nuisances) unless they cause physical damage to the real property. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 936-937 [55 Cal.Rptr.2d 724, 920 P.2d 669].) ■ Since Intel does not claim Hamidi's electronically trans-mitted messages physically damaged its servers, it could not prove a trespass to land even were we to treat the computers as a type of real property. Some further extension of the conceit would be required, under which the elec-tronic signals Hamidi sent would be recast as tangible intruders, perhaps as tiny messengers rushing through the "hallways" of Intel's computers and bursting out of employees' computers to read them Hamidi's missives. But such fictions promise more confusion than clarity in the law. (See *eBay*, *supra*, 100 F.Supp.2d at pp. 1065-1066 [rejecting eBay's argument that the defendant's automated data searches "should be thought of as equivalent to sending in an army of 100,000 robots a day to check the prices in a competitor's store"].)

The plain fact is that computers, even those making up the Internet, are—like such older communications equipment as telephones and fax machines—personal property, not realty. Professor Epstein observes that "[a]lthough servers may be moved in real space, they cannot be moved in cyberspace," because an Internet server must, to be useful, be accessible at a known address. But the same is true of the telephone: to be useful for incoming communication, the telephone must remain constantly linked to the same number (or, when the number is changed, the system must include some forwarding or notification capability, a qualification that also applies to computer addresses). Does this suggest that an unwelcome message delivered through a telephone or fax machine should be viewed as a trespass to a type of real property? We think not: As already discussed, the contents of a telephone communication may cause a variety of injuries and may be the basis for a variety of tort actions (e.g., defamation, intentional infliction of emotional distress, invasion of privacy), but the injuries are not to an

interest in property, much less real property, and the appropriate tort is not trespass.[7]

More substantively, Professor Epstein argues that a rule of computer server inviolability will, through the formation or extension of a market in computer-to-computer access, create "the right social result." In most circumstances, he predicts, companies with computers on the Internet will continue to authorize transmission of information through e-mail, Web site searching, and page linking because they benefit by that open access. When a Web site owner does deny access to a particular sending, searching, or linking computer, a system of "simple one-on-one negotiations" will arise to provide the necessary individual licenses.

Other scholars are less optimistic about such a complete propertization of the Internet. Professor Mark Lemley of the University of California, Berkeley, writing on behalf of an amici curiae group of professors of intellectual property and computer law, observes that under a property rule of server inviolability, "each of the hundreds of millions of [Internet] users must get permission in advance from anyone with whom they want to communicate and anyone who owns a server through which their message may travel." The consequence for e-mail could be a substantial reduction in the freedom of electronic communication, as the owner of each computer through which an electronic message passes could impose its own limitations on message content or source. As Professor Dan Hunter of the University of Pennsylvania asks rhetorically: "Does this mean that one must read the 'Terms of Acceptable Email Usage' of every email system that one emails in the course of an ordinary day? If the University of Pennsylvania had a policy

---

[7]The tort law discussion in Justice Brown's dissenting opinion similarly suffers from an overreliance on metaphor and analogy. Attempting to find an actionable trespass, Justice Brown analyzes Intel's e-mail system as comparable to the exterior of an automobile (dis. opn. of Brown, J., *post*, at p. 1367), a plot of land (*id.* at p. 1377), the interior of an automobile (*id.* at p. 1379), a toothbrush (*id.* p. at 1382), a head of livestock (*id.* at pp. 1382-1383), and a mooring buoy (*id.* at pp. 1383-1384), while Hamidi is characterized as a vandal damaging a school building (*id.* at p. 1381) or a prankster unplugging and moving employees' computers (*id.* at p. 1383). These colorful analogies tend to obscure the plain fact that this case involves communications equipment, used by defendant to communicate. Intel's e-mail system was equipment designed for speedy communication between employees and the outside world; Hamidi communicated with Intel employees over that system in a manner entirely consistent with its design; and Intel objected not because of an offense against the integrity or dignity of its computers, but because the communications themselves affected employee-recipients in a manner Intel found undesirable. The proposal that we extend trespass to chattels to cover any communication that the owner of the communications equipment considers annoying or distracting raises, moreover, concerns about control over the flow of information and views that would not be presented by, for example, an injunction against chasing another's cattle or sleeping in her car.

that sending a joke by email would be an unauthorized use of its system, then under the logic of [the lower court decision in this case], you would commit 'trespass' if you emailed me a . . . cartoon." (Hunter, *Cyberspace as Place and the Tragedy of the Digital Anticommons* (2003) 91 Cal. L.Rev. 439, 508-509.)

Web site linking, Professor Lemley further observes, "would exist at the sufferance of the linked-to party, because a Web user who followed a 'disapproved' link would be trespassing on the plaintiff's server, just as sending an e-mail is trespass under the [lower] court's theory." Another writer warns that "[c]yber-trespass theory will curtail the free flow of price and product information on the Internet by allowing website owners to tightly control who and what may enter and make use of the information housed on its Internet site." (Chang, *Bidding on Trespass: eBay, Inc. v. Bidder's Edge, Inc. and the Abuse of Trespass Theory in Cyberspace Law* (2001) 29 AIPLA Q.J. 445, 459.) A leading scholar of Internet law and policy, Professor Lawrence Lessig of Stanford University, has criticized Professor Epstein's theory of the computer server as quasi-real property, previously put forward in the *eBay* case (*eBay, supra,* 100 F.Supp.2d 1058), on the ground that it ignores the costs to society in the loss of network benefits: "eBay benefits greatly from a network that is open and where access is free. It is this general feature of the Net that makes the Net so valuable to users and a source of great innovation. And to the extent that individual sites begin to impose their own rules of exclusion, the value of the network as a network declines. If machines must negotiate before entering any individual site, then the costs of using the network climb." (Lessig, The Future of Ideas: The Fate of the Commons in a Connected World (2001) p. 171; see also Hunter, *Cyberspace as Place and the Tragedy of the Digital Anticommons, supra,* 91 Cal. L.Rev. at p. 512 ["If we continue to mark out anticommons claims in cyberspace, not only will we preclude better, more innovative uses of cyberspace resources, but we will lose sight of what might be possible"].)

We discuss this debate among the amici curiae and academic writers only to note its existence and contours, not to attempt its resolution. Creating an absolute property right to exclude undesired communications from one's e-mail and Web servers might help force spammers to internalize the costs they impose on ISP's and their customers. But such a property rule might also create substantial new costs, to e-mail and e-commerce users and to society generally, in lost ease and openness of communication and in lost network benefits. In light of the unresolved controversy, we would be acting rashly to adopt a rule treating computer servers as real property for purposes of trespass law.

The Legislature has already adopted detailed regulations governing UCE. (Bus. & Prof. Code, §§ 17538.4, 17538.45; see generally *Ferguson v. Friendfinders, Inc., supra,* 94 Cal.App.4th 1255.) It may see fit in the future also to regulate noncommercial e-mail, such as that sent by Hamidi, or other kinds of unwanted contact between computers on the Internet, such as that alleged in *eBay, supra,* 100 F.Supp.2d 1058. But we are not persuaded that these perceived problems call at present for judicial creation of a rigid property rule of computer server inviolability. We therefore decline to create an exception, covering Hamidi's unwanted electronic messages to Intel employees, to the general rule that a trespass to chattels is not actionable if it does not involve actual or threatened injury to the personal property or to the possessor's legally protected interest in the personal property. No such injury having been shown on the undisputed facts, Intel was not entitled to summary judgment in its favor.

## III. *Constitutional Considerations*

Because we conclude no trespass to chattels was shown on the summary judgment record, making the injunction improper on common law grounds, we need not address at length the dissenters' constitutional arguments. A few clarifications are nonetheless in order.

Justice Mosk asserts that this case involves only "a private entity seeking to enforce private rights against trespass." (Dis. opn. of Mosk, J., *post,* at p. 1395.) But the injunction here was issued by a state court. ▉ While a private refusal to transmit another's electronic speech generally does not implicate the First Amendment, because no governmental action is involved (see *Cyber Promotions, Inc. v. America Online, Inc.* (E.D.Pa. 1996) 948 F.Supp. 436, 441-445 [spammer could not force private ISP to carry its messages]), the use of government power, whether in enforcement of a statute or ordinance *or by an award of damages or an injunction in a private lawsuit,* is state action that must comply with First Amendment limits. (*Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 668 [111 S.Ct. 2513, 2517, 115 L.Ed.2d 586]; *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886, 916, fn. 51 [102 S.Ct. 3409, 3427, 73 L.Ed.2d 1215]; *New York Times v. Sullivan* (1964) 376 U.S. 254, 265 [84 S.Ct. 710, 718, 11 L.Ed.2d 686, 95 A.L.R.2d 1412].) Nor does the nonexistence of a "constitutional right to trespass" (dis. opn. of Mosk, J., *post,* at p. 1395) make an injunction in this case per se valid. ▉ Unlike, for example, the trespasser-to-land defendant in *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244 [121 Cal.Rptr.2d 810], Hamidi himself had no tangible presence on Intel property, instead speaking from his own home through his

computer. He no more invaded Intel's property than does a protester holding a sign or shouting through a bullhorn outside corporate headquarters, posting a letter through the mail, or telephoning to complain of a corporate practice. (See *Madsen v. Women's Health Center* (1994) 512 U.S. 753, 765 [114 S.Ct. 2516, 2525, 129 L.Ed.2d 593] [injunctions restraining such speakers must "burden no more speech than necessary to serve a significant government interest"].)[8]

Justice Brown relies upon a constitutional "right not to listen," rooted in the listener's "personal autonomy" (dis. opn. of Brown, J., *post*, at p. 1374), as compelling a remedy against Hamidi's messages, which she asserts were sent to "unwilling" listeners (*id.* at p. 1369). Even assuming a corporate entity could under some circumstances claim such a personal right, here the intended and actual recipients of Hamidi's messages were individual Intel employees, rather than Intel itself. The record contains no evidence Hamidi sent messages to any employee who notified him such messages were unwelcome. In any event, such evidence would, under the dissent's rationale of a right not to listen, support only a *narrow* injunction aimed at protecting individual recipients who gave notice of their rejection. (See *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60, 72 [103 S.Ct. 2875, 2883, 77 L.Ed.2d 469] [government may not act on behalf of all addressees by generally prohibiting mailing of materials related to contraception, where those recipients who may be offended can simply ignore and discard the materials]; *Martin v. City of Struthers* (1943) 319 U.S. 141, 144 [63 S.Ct. 862, 863, 87 L.Ed. 1313] [anti-canvassing ordinance improperly "substitutes the judgment of the community for the judgment of the individual householder"]; cf. *Rowan v. U.S. Post Office Dept.* (1970) 397 U.S. 728, 736 [90 S.Ct. 1484, 1490, 25 L.Ed.2d 736] ["householder" may exercise "individual autonomy" by refusing delivery of offensive mail].) The principle of a right not to listen, founded in personal autonomy, cannot justify the sweeping injunction issued here against all communication to Intel addresses, for such a right, logically, can be exercised only by, or at the behest of, the recipient himself or herself.

---

[8]Justice Brown would distinguish *Madsen v. Women's Health Center*, on the ground that the operators of the health center in that case would not have been entitled to "drive[] [the protesters] from the public streets," whereas Intel was entitled to block Hamidi's messages as best it could. (Dis. opn. of Brown, J., *post*, at p. 1370, fn. 1.) But the health center operators *were* entitled to block protesters' messages—as best they could—by closing windows and pulling blinds. That a property owner may take physical measures to prevent the transmission of others' speech into or across the property does not imply that a court order enjoining the speech is not subject to constitutional limitations.

---

DISPOSITION

The judgment of the Court of Appeal is reversed.

Kennard, J., Moreno, J., and Perren, J.,* concurred.

**KENNARD, J.**—I concur.

Does a person commit the tort of trespass to chattels by making occasional personal calls to a mobile phone despite the stated objection of the person who owns the mobile phone and pays for the mobile phone service? Does it matter that the calls are not made to the mobile phone's owner, but to another person who ordinarily uses that phone? Does it matter that the person to whom the calls are made has not objected to them? Does it matter that the calls do not damage the mobile phone or reduce in any significant way its availability or usefulness?

The majority concludes, and I agree, that using another's equipment to communicate with a third person who is an authorized user of the equipment and who does not object to the communication is trespass to chattels only if the communications damage the equipment or in some significant way impair its usefulness or availability.

Intel Corporation has my sympathy. Unsolicited and unwanted bulk e-mail, most of it commercial, is a serious annoyance and inconvenience for persons who communicate electronically through the Internet, and bulk e-mail that distracts employees in the workplace can adversely affect overall productivity. But, as the majority persuasively explains, to establish the tort of trespass to chattels in California, the plaintiff must prove either damage to the plaintiff's personal property or actual or threatened impairment of the plaintiff's ability to use that property. Because plaintiff Intel has not shown that defendant Kourosh Kenneth Hamidi's occasional bulk e-mail messages to Intel's employees have damaged Intel's computer system or impaired its functioning in any significant way, Intel has not established the tort of trespass to chattels.

This is not to say that Intel is helpless either practically or legally. As a practical matter, Intel need only instruct its employees to delete messages from Hamidi without reading them and to notify Hamidi to remove their workplace e-mail addresses from his mailing lists. Hamidi's messages promised to remove recipients from the mailing list on request, and there is no

---

*Associate Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

evidence that Hamidi has ever failed to do so. From a legal perspective, a tort theory other than trespass to chattels may provide Intel with an effective remedy if Hamidi's messages are defamatory or wrongfully interfere with Intel's economic interests. (See maj. opn., *ante,* at p. 1347.) Additionally, the Legislature continues to study the problems caused by bulk e-mails and other dubious uses of modern communication technologies and may craft legislation that accommodates the competing concerns in these sensitive and highly complex areas.

Accordingly, I join the majority in reversing the Court of Appeal's judgment.

**BROWN, J.,** Dissenting.—Candidate A finds the vehicles that candidate B has provided for his campaign workers, and A spray paints the water soluble message, "Fight corruption, vote for A" on the bumpers. The majority's reasoning would find that notwithstanding the time it takes the workers to remove the paint and the expense they incur in altering the bumpers to prevent further unwanted messages, candidate B does not deserve an injunction unless the paint is so heavy that it reduces the cars' gas mileage or otherwise depreciates the cars' market value. Furthermore, candidate B has an obligation to permit the paint's display, because the cars are driven by workers and not B personally, because B allows his workers to use the cars to pick up their lunch or retrieve their children from school, or because the bumpers display B's own slogans. I disagree.

Intel Corporation has invested millions of dollars to develop and maintain a computer system. It did this not to act as a public forum but to enhance the productivity of its employees. Kourosh Kenneth Hamidi sent as many as 200,000 e-mail messages to Intel employees. The time required to review and delete Hamidi's messages diverted employees from productive tasks and undermined the utility of the computer system. "There may . . . be situations in which the value to the owner of a particular type of chattel may be impaired by dealing with it in a manner that does not affect its physical condition." (Rest.2d Torts, § 218, com. h, p. 422.) This is such a case.

The majority repeatedly asserts that Intel objected to the hundreds of thousands of messages solely due to their content, and proposes that Intel seek relief by pleading content-based speech torts. This proposal misses the point that Intel's objection is directed not toward Hamidi's message but his use of Intel's property to display his message. Intel has not sought to prevent Hamidi from expressing his ideas on his Web site, through private mail (paper or electronic) to employees' homes, or through any other means like picketing or billboards. But as counsel for Intel explained during oral

argument, the company objects to Hamidi's using Intel's property to advance his message.

Of course, Intel deserves an injunction even if its objections are based entirely on the e-mail's content. Intel is entitled, for example, to allow employees use of the Internet to check stock market tables or weather forecasts without incurring any concomitant obligation to allow access to pornographic Web sites. (*Loving v. Boren* (W.D.Okla. 1997) 956 F.Supp. 953, 955.) A private property owner may choose to exclude unwanted mail for any reason, including its content. (*Rowan v. U.S. Post Office Dept.* (1970) 397 U.S. 728, 738 [90 S.Ct. 1484, 1491 25 L.Ed.2d 736] (*Rowan*); *Tillman v. Distribution Systems of America Inc.* (1996) 224 A.D.2d 79 [648 N.Y.S.2d 630, 635] (*Tillman*).)

The majority refuses to protect Intel's interest in maintaining the integrity of its own system, contending that (1) Hamidi's mailings did not physically injure the system; (2) Intel receives many unwanted messages, of which Hamidi's are but a small fraction; (3) Intel must have contemplated that it would receive some unwanted messages; and (4) Hamidi used the e-mail system for its intended purpose, to communicate with employees.

Other courts have found a protectible interest under very similar circumstances. In *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559 [54 Cal.Rptr.2d 468] (*Thrifty-Tel*), the Court of Appeal found a trespass to chattels where the defendants used another party's access code to search for an authorization code with which they could make free calls. The defendants' calls did not damage the company's system in any way; they were a minuscule fraction of the overall communication conducted by the phone network; and the company could have reasonably expected that some individuals would attempt to obtain codes with which to make free calls (just as stores expect shoplifters). Moreover, had the defendants succeeded in making free calls, they would have been using the telephone system as intended. (*Id.* at p. 1563.)

Because I do not share the majority's antipathy toward property rights and believe the proper balance between expressive activity and property protection can be achieved without distorting the law of trespass, I respectfully dissent.

### THE INSTANT FINDING OF A TRESPASS CONFORMS THE LAW ON ELECTRONIC MAIL TO THAT OF OTHER FORMS OF COMMUNICATION

The majority endorses the view of the Court of Appeal dissent, and reviews a finding of a trespass in this case as a radical decision that will

endanger almost every other form of expression. Contrary to these concerns, the Court of Appeal decision belongs not to a nightmarish future but to an unremarkable past—a long line of cases protecting the right of an individual not to receive an unwanted message after having expressed that refusal to the speaker. It breaks no new legal ground and follows traditional rules regarding communication.

It is well settled that the law protects a person's right to decide to whom he will speak, to whom he will listen, and to whom he will not listen. (*Martin v. City of Struthers* (1943) 319 U.S. 141, 149 [63 S.Ct. 862, 866, 87 L.Ed. 1313] (*Martin*) [noting the "constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributors"].) As the United States Supreme Court observed, "we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes" (*Frisby v. Schultz* (1988) 487 U.S. 474, 485 [108 S.Ct. 2495, 2502, 101 L.Ed.2d 420]), whether the unwanted speech comes in the form of a door-to-door solicitor (see *Martin*, at pp. 147-148 [63 S.Ct. at pp. 865-866]), regular "snail" mail (*Rowan, supra*, 397 U.S. 728), radio waves (*FCC v. Pacifica Foundation* (1978) 438 U.S. 726 [98 S.Ct. 3026, 57 L.Ed.2d 1073]), or other forms of amplified sound (*Kovacs v. Cooper* (1949) 336 U.S. 77 [69 S.Ct. 448, 93 L.Ed. 513, 10 A.L.R.2d 608]). (See *Frisby v. Schultz*, at p. 485 [108 S.Ct. at p. 2502].)

Of course, speakers have rights too, and thus the result is a balancing: speakers have the right to initiate speech but the listener has the right to refuse to listen or to terminate the conversation. This simple policy thus supports Hamidi's right to send e-mails initially, but not after Intel expressed its objection.

*Watchtower Bible and Tract Society v. Village of Stratton* (2002) 536 U.S. 150 [122 S.Ct. 2080, 153 L.Ed.2d 205] does not compel a contrary result. *Watchtower* follows *Martin, supra*, 319 U.S. 141, in holding that the government may not bar a speaker from a homeowner's door, *but the homeowner surely may*. The *Martin* court invalidated an ordinance that banned all door-to-door soliciting (in that case the speech was the noncommercial ideas of a religious sect), even at homes where the residents wished to hear the speech. This exclusion "substitute[d] the judgment of the community for the judgment of the individual householder." (*Martin*, at p. 144 [63 S.Ct. at p. 863].) Instead, the court authorized the property owner to indicate his desire not to be disturbed. "This or any similar regulation leaves the decision as to whether distributers of literature may lawfully call at a home where it belongs—with the homeowner himself." (*Id.* at p. 148 [63 S.Ct. at p. 866].) A speaker is entitled to speak with willing listeners but not unwilling ones.

"A city can punish those who call at a home *in defiance of the previously expressed will of the occupant* . . . ." (*Ibid.*, italics added.) *Watchtower, supra,* 536 U.S. 150, reaffirmed the listener's complete autonomy to accept or reject offered speech.

*Martin* further recognized that the decisions regarding whether to accept a particular message must be made by a nongovernmental actor, but not necessarily by every single potential listener on an individual level. "No one supposes . . . that the First Amendment prohibits a state from preventing the distribution of leaflets in a church against the will of the *church authorities.*" (*Martin, supra,* 319 U.S. at p. 143 [63 S.Ct. at p. 863], italics added.) Unanimity among the congregation is not required. (See also *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244 [121 Cal.Rptr.2d 810] (*Church of Christ*).) The Supreme Court reaffirmed this rule in *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551 [92 S.Ct. 2219, 33 L.Ed.2d 131] (*Lloyd*) and *Hudgens v. NLRB* (1976) 424 U.S. 507 [96 S.Ct. 1029, 47 L.Ed.2d 196], where private shopping mall owners validly excluded speakers from their malls. The owners could make this decision, even though they were not the "intended and actual recipients of [the speakers'] messages." (Maj. opn., *ante,* at p. 1365.) The owners had no obligation to obtain the agreement of every individual store within the mall, or of every employee within every store in the mall.[1]

---

[1] The majority distinguishes *Church of Christ* on its facts, by asserting that a former church member could be barred from church property because she had a "tangible presence" on the church's property. (Maj. opn., *ante,* at p. 1364.) But the majority does not refute the legal point that "the mere judicial enforcement of neutral trespass laws by the private owner of property does not alone render it a state actor." (*CompuServe Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F.Supp. 1015, 1026 (*CompuServe*).)

The First Amendment does not shield Hamidi's speech, and the majority's authorities do not suggest it does. On the contrary, the high court recognized that the First Amendment does not preclude generally applicable laws, even where they incidentally restrict speech. (*Cohen v. Cowles Media Co.* (1991) 501 U.S. 663, 669 [111 S.Ct. 2513, 2518, 115 L.Ed.2d 586].) There is thus no right to intrude upon privately owned property simply to generate speech. (*Ibid.*)

The majority cites *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412], as well as *NAACP v. Claiborne Hardware Co.* (1982) 458 U.S. 886 [102 S.Ct. 3409, 73 L.Ed.2d 1215], and *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753 [114 S.Ct. 2516, 129 L.Ed.2d 593], none of which is apposite. In these cases, speakers enjoyed First Amendment protection when they spoke to the public through a newspaper advertisement (with the newspaper's consent) or a protest on a public street, a traditional public forum. (*Schneider v. State* (1939) 308 U.S. 147 [60 S.Ct. 146, 84 L.Ed. 155].) If Hamidi had similarly expressed his anti-Intel feelings in a newspaper advertisement or from a public street, these authorities would be on point. By contrast, nothing in *New York Times* entitles a computer hacker to alter an online newspaper's content so that it expresses the hacker's opinions against the paper's wishes.

Intel's right to use reasonable force (see maj. opn., *ante,* at p. 1352), to prevent interference with its property distinguishes this case from the majority's United States Supreme Court

This rule applies not only to real property but also to chattels like a computer system. In *Loving v. Boren, supra,* 956 F.Supp. at page 955, the court held that the University of Oklahoma could restrict the use of its computer system to exclude pornographic messages, notwithstanding the contrary preferences of any individual faculty member (or student). Intel may similarly control the use of its own property, regardless of any specific employee's contrary wishes. (See also Bus. & Prof. Code, § 17538.4, subd. (h).) In any event, Hamidi had ample opportunity in his preobjection e-mails to direct employees to his Web site or request the employees' private e-mail addresses. He thus continues to use the internal Intel network to speak to an unreceptive audience.[2]

Accordingly, all that matters is that Intel exercised the right recognized in *Martin* to exclude unwanted speech. The instant case is considerably easier than *Lloyd* and *Hudgens* in light of the severe infringement on Intel's autonomy. Whereas the mall owners had been asked merely to allow others to speak, Intel, through its server, must itself actively "participate in the dissemination of an ideological message by displaying it on . . . private property in a manner and for the express purpose that it be observed and read . . . ." (*Wooley v. Maynard* (1977) 430 U.S. 705, 713 [97 S.Ct. 1428, 1434-1435, 51 L.Ed.2d 752].)

The principle that a speaker's right to speak to a particular listener exists for only so long as the listener wishes to listen applies also to mail delivery. (*Rowan, supra,* 397 U.S. 728.) In *Bolger v. Youngs Drug Products Corp.* (1983) 463 U.S. 60 [103 S.Ct. 2875, 77 L.Ed.2d 469] (*Bolger*), the court struck down a law barring the mailing of information regarding contraception because the *government* was deciding which messages could be delivered. But *Bolger* cited *Rowan* with approval—a case that upheld the procedure by which *private parties* could refuse to receive specific materials. "[A]

precedents. Whereas Intel could attempt to block the unwanted messages, Sullivan, who claimed to have been libeled by the newspaper, could not have burned the newspapers to prevent their publication, nor could the targets of the public protesters in *Claiborne Hardware* or *Madsen* have driven them from the public streets where they were speaking. Contrariwise, Intel, as the majority does not dispute, would have been allowed to suppress Hamidi's messages if it had been able to do so.

[2]Hamidi required employees to take affirmative steps to remove themselves from the mailing list. Not only might some employees have declined to do so because such removal might involve a greater burden than simply deleting the unwanted message, but they also might reasonably have assumed that such requests could be counterproductive. (Whang, *An Analysis of California's Common and Statutory Law Dealing with Unsolicited Commercial Electronic Mail: An Argument for Revision* (2000) 37 San Diego L.Rev. 1201, 1205-1206 (Whang).) " 'Don't respond [to spam]! Don't ask them to "take you off a list." People who respond—even negatively—are viewed as Grade A targets. You will probably get more junk than ever.' " (*Id.* at p. 1206 & fn. 24, quoting Campbell, *Waging War on Internet Spammers*, Toronto Star (Aug. 26, 1999) p. L5.)

sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail." (*Rowan, supra*, 397 U.S. at p. 736 [90 S.Ct. at p. 1490].) Citing *Martin, supra*, 319 U.S. 141, *Rowan* held "a mailer's right to communicate must stop at the mailbox of an unreceptive addressee. [¶] . . . [¶] To hold less would tend to license a form of *trespass*." (*Rowan*, at pp. 736-737 [90 S.Ct. at p. 1490], italics added.) Furthermore, *Bolger* expressly contemplated that some family members would exclude materials on behalf of others; the right to accept or reject speech thus belonged to the household, not each individual member. (*Bolger*, at p. 73 [103 S.Ct. at pp. 2883-2884].)

The pertinent precedent for an anti-spam case is *Rowan*, which involved private action, not *Bolger*, which involved governmental action. " '[H]ere we are not dealing with a government agency which seeks to preempt in some way the ability of a publisher to contact a potential reader; rather, we are dealing with a reader who is familiar with the publisher's product, and who is attempting to prevent the unwanted dumping of this product on his property.' " (*CompuServe, supra*, 962 F.Supp. at p. 1027, quoting *Tillman, supra*, 648 N.Y.S.2d at p. 635.)

*Rowan* further held the recipient could reject a message for any subjective reason, including annoyance or discomfort at its content. (*Rowan, supra*, 397 U.S. at p. 738 [90 S.Ct. at p. 1491].) A private actor thus has no obligation to hear all messages just because he chooses to hear some. A homeowner's desire to receive letters from relatives or friends does not compel him to accept offensive solicitations. It is therefore possibly true but certainly immaterial that Intel might have expected that some unwanted messages would be sent to its employees. A store that opens its doors to the public should reasonably expect some individuals will attempt to shoplift, but the store does not thereby incur an obligation to accept their presence and the disruption they cause.

If we did create an "accept one, accept all" rule, whereby a party's acceptance of outside mail abrogates the right to exclude any messages, the result would likely be less speech, not more. Courts have recognized the seeming paradox that permitting the exclusion of speech is necessary to safeguard it. "It is ironic that if defendants were to prevail on their First Amendment arguments, the viability of electronic mail as an effective means of communication for the rest of society would be put at risk." (*CompuServe, supra*, 962 F.Supp. at p. 1028.) The Court of Appeal below likewise observed that employers' tolerance for reasonable personal use of computers "would vanish if they had no way to limit such personal usage of company equipment." (Cf. *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S.

241, 256 [94 S.Ct. 2831, 2839, 41 L.Ed.2d 730] [compulsory fair reply law would deter newspaper from speaking to avoid forced expression of disagreeable speech].) Furthermore, merely *permitting* exclusion may be insufficient absent a mechanism for enforcement. If spamming expands to a new volume of activity, "[t]he cost increases that would result from a massive increase in volume could even lead many sites to discontinue supporting standard e-mail altogether. Within a few years, e-mail may no longer be the near-universal method for communicating with people via the Internet that it is today." (Sorkin, *Technical and Legal Approaches to Unsolicited Electronic Mail* (2001) 35 U.S.F. L.Rev. 325, 338-339, fn. omitted (Sorkin).)

The majority expresses its agreement with the dissent below, which found that if the lost productivity of Intel's employees serves as the requisite injury, "then every unsolicited communication that does not further the business's objectives (including telephone calls) interferes with the chattel. . . . [¶] . . . [¶] . . . Under Intel's theory, even lovers' quarrels could turn into trespass suits by reason of the receipt of unsolicited letters or calls from the jilted lover. Imagine what happens after the angry lover tells her fiancé not to call again and violently hangs up the phone. Fifteen minutes later the phone rings. Her fiancé wishing to make up? No, trespass to chattel." But just as private citizens may deny access to door-to-door solicitors or mailers, they may also maintain the integrity of their phone system from callers they wish to exclude. A telephone, no less than an envelope, may be an instrument of trespass. (See *Thrifty-Tel, supra*, 46 Cal.App.4th at pp. 1566-1567.)

Individuals may not commandeer the communications systems of unwilling listeners, even if the speakers are jilted lovers who wish to reconcile. (*People v. Miguez* (1990) 147 Misc.2d 482 [556 N.Y.S.2d 231].)[3] The *Miguez* defendant repeatedly left messages[4] on the complainant's answering machine and pager, "interrupting him in his professional capacity as a doctor." (*Miguez*, at p. 232.) It was the *disruptive volume* (not the specific content) of calls from which the complainant was entitled to relief. Similarly, an individual could not lawfully telephone a police department 28 times in 3 hours and 20 minutes to inquire about a civil matter where the police told him not to call because he was disrupting police operations. (*People v. Smith* (1977) 89 Misc.2d 789 [392 N.Y.S.2d 968, 969-970].)

The law on faxes is even stricter. As faxes shift the costs of speech from the speaker to the listener, senders of commercial e-mail must obtain prior

---

[3]New York further proscribes such conduct as criminal. (*People v. Miguez, supra*, 556 N.Y.S.2d 231.)

[4]Some of the messages reflected a desire to reconcile: " ' "Please don't hurt me anymore. You've hurt me enough, I still love you." ' " A later call stated, " ' "Eddie I want to give you my number; even if you don't call me, I want you to have it." ' " (*People v. Miguez, supra*, 556 N.Y.S.2d at p. 232.)

consent from the recipient. (47 U.S.C. § 227.) Likewise, the users of auto-mated telephone dialers also must obtain prior consent where they result in costs to the recipient. (47 U.S.C. § 227(b)(1)(A)(iii); *Missouri ex rel. Nixon v. American Blast Fax, Inc.* (8th Cir. 2003) 323 F.3d 649, 657 (*Blast Fax*).) Because e-mail permits mass unwanted communications without the sender's having to bear the costs of postage or labor, there is a much greater incentive for sending unwanted e-mail, and thus the potential volume of unwanted e-mail may create even greater problems for recipients than the smaller volume of unwanted faxes. (Whang, *supra*, 37 San Diego L.Rev. at p. 1216 & fn. 112.) In any event, honoring the wishes of a party who requests the cessation of unwanted telecommunications, whether by phone, fax or e-mail, does nothing more than apply *Martin* to today's technology. (Shannon, *Combating Unsolicited Sales Calls: The "Do-Not-Call" Approach to Solving the Telemarketing Problem* (2001) 27 J. Legis. 381, 394.)

Therefore, before the listener objects, the speaker need not fear he is trespassing. Afterwards, however, the First Amendment principle of respect for personal autonomy compels forbearance. "The Court has traditionally respected the right of a householder to bar, by order or notice, [speakers] from his property. See *Martin v. City of Struthers, supra*, . . . . In this case *the mailer's right to communicate is circumscribed only by an affirmative act of the addressee giving notice that he wishes no further mailings* from that mailer." (*Rowan, supra*, 397 U.S. at p. 737 [90 S.Ct. at p. 1490], italics added.) Speakers need not obtain affirmative consent before speaking, and thus have no reason to fear unexpected liability for trespass, but they must respect the decisions of listeners once expressed. The First Amendment protects the right not to listen just as it protects the right to speak.

## THE TRIAL COURT CORRECTLY ISSUED THE INJUNCTION

Intel had the right to exclude the unwanted speaker from its property, which Hamidi does not dispute; he does not argue that he has a right to force unwanted messages on Intel. The instant case thus turns on the question of whether Intel deserves a remedy for the continuing violation of its rights. I believe it does, and as numerous cases have demonstrated, an injunction to prevent a trespass to chattels is an appropriate means of enforcement.

The majority does not find that Hamidi has an affirmative right to have Intel transmit his messages, but denies Intel any remedy. Admittedly, the case would be easier if precise statutory provisions supported relief, but in the rapidly changing world of technology, in which even technologically savvy providers like America Online and CompuServe are one step behind spammers, the Legislature will likely remain three or four steps behind. In

any event, the absence of a statutory remedy does not privilege Hamidi's interference with Intel's property. Nor are content-based speech torts adequate for violations of property rights unrelated to the speech's content. In any event, the possibility of another avenue for relief does not preclude an injunction for trespass to chattels.

The majority denies relief on the theory that Intel has failed to establish the requisite actual injury. As discussed, *post*, however, the injunction was properly granted because the rule requiring actual injury pertains to damages, not equitable relief, and thus courts considering comparable intrusions have provided injunctive relief without a showing of actual injury. Furthermore, there was actual injury as (1) Intel suffered economic loss; (2) it is sufficient for the injury to impair the chattel's utility to the owner rather than the chattel's market value; and (3) even in the absence of any injury to the owner's utility, it is nevertheless a trespass where one party expropriates for his own use the resources paid for by another.

*Harmless Trespasses to Chattels May Be Prevented*

Defendant Hamidi used Intel's server in violation of the latter's demand to stop. This unlawful use of Intel's system interfered with the use of the system by Intel employees. This misconduct creates a cause of action. "[I]t is a trespass to damage goods or destroy them, *to make an unpermitted use of them*, or to move them from one place to another." (Prosser & Keeton on Torts (5th ed. 1984) Trespass to Chattels, § 14, p. 85, fns. omitted & italics added.) "[T]he unlawful taking away of another's personal property, the seizure of property upon a wrongful execution, and *the appropriation of another's property to one's own use, even for a temporary purpose*, constitute trespasses, although a mere removal of property without injuring it is not a trespass *when done by one acting rightfully*." (7 Speiser et al., American Law of Torts (1990) Trespass, § 23:23, p. 667, fns. omitted & italics added (*Speiser*).)

Regardless of whether property is real or personal, it is beyond dispute that an individual has the right to have his personal property free from interference. There is some division among authorities regarding the available remedy, particularly whether a harmless trespass supports a claim for nominal damages. The North Carolina Court of Appeal has found there is no damage requirement for a trespass to chattel. (See *Hawkins v. Hawkins* (1991) 101 N.C.App. 529 [400 S.E.2d 472, 475].) "A trespass to goods is actionable *per se* without any proof of actual damage. Any unauthorized touching or moving of an object is actionable at the suit of the possessor of it, even though no harm ensues." (Salmond & Heuston, The Law of Torts

(21st ed. 1996) Trespass to Goods, § 6.2, p. 95, fns. omitted.) Several authorities consider a harmless trespass to goods actionable per se only if it is intentional. (Winfield & Jolowicz on Torts (10th ed. 1975) Trespass to Goods, p. 403 (Winfield & Jolowicz); Clerk & Lindsell on Torts (17th ed. 1995) ¶ 13-159, p. 703.) The Restatement Second of Torts, section 218, which is less inclined to favor liability, likewise forbids unauthorized use and recognizes the inviolability of personal property. However, the Restatement permits the owner to *prevent the injury* beforehand, or *receive compensation* afterward, but not to *profit from the trespass* through the remedy of damages unrelated to actual harm, which could result in a windfall. (*Thrifty-Tel, supra,* 46 Cal.App.4th at p. 1569; Whang, *supra,* 37 San Diego L.Rev. at p. 1223.) "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection *by an action for nominal damages* for harmless intermeddlings with the chattel. . . . Sufficient legal protection of the possessor's interest in the mere *inviolability of his chattel* is afforded by his *privilege to use reasonable force* to protect his possession against *even harmless interference.*" (Rest.2d Torts, § 218, com. e, pp. 421-422, italics added.) Accordingly, the protection of land and chattels may differ on the question of nominal damages unrelated to actual injury. The authorities agree, however, that (1) the chattel is inviolable, (2) the trespassee need not tolerate even harmless interference, and (3) the possessor may use reasonable force to prevent it. Both California law and the Restatement authorize reasonable force regardless of whether the property in question is real or personal. (Civ. Code, § 51; Rest.2d Torts, § 77.)

The law's special respect for land ownership supports liability for damages even without actual harm. (Speiser, *supra,* § 23:1, p. 592.) By contrast, one who suffers interference with a chattel may *prevent* the interference before or during the fact, *or recover actual damages* (corresponding to the harm suffered), but at least according to the Restatement, may not recover damages in excess of those suffered. But the Restatement expressly refutes defendant's assertion that only real property is inviolable. From the modest distinction holding that only victims of a trespass to land may profit in the form of damages exceeding actual harm, defendant offers the position that only trespasses to land may be *prevented.* The law is to the contrary; numerous cases have authorized injunctive relief to safeguard the inviolability of personal property.

The law favors prevention over posttrespass recovery, as it is permissible to use reasonable force to retain possession of a chattel but not to recover it after possession has been lost. (See 1 Dobbs, The Law of Torts (2001) §§ 76, 81, pp. 170, 186; see also *Deevy v. Tassi* (1942) 21 Cal.2d 109, 118-119 [130

P.2d 389].) Notwithstanding the general rule that injunctive relief requires a showing of irreparable injury (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 782, p. 239), Witkin also observes there are exceptions to this rule where injunctive relief is appropriate; these include repetitive trespasses. (*Id.*, § 784, p. 242.) The first case cited in that section, *Mendelson v. McCabe* (1904) 144 Cal. 230 [77 P. 915] (*Mendelson*), is apposite to our analysis.

In entering McCabe's property, Mendelson exceeded the scope of the consent he received to do so. McCabe had granted Mendelson the right to pass through his property on condition that Mendelson close the gates properly, which he did not do. (*Mendelson, supra*, 144 Cal. at pp. 231-232.) McCabe "did not allege that any actual damage had been caused by the acts of [Mendelson] . . . in leaving the gates open." (*Id.* at p. 232.) After finding that Mendelson planned to continue his conduct over McCabe's objection, we authorized injunctive relief. (*Id.* at pp. 233-234.) Our analysis in *Mendelson* applies here as well. "The right to an injunction is not always defeated by the mere absence of substantial damage from the acts sought to be enjoined. The acts of the plaintiff in leaving the gates open, if persisted in as he threatens, will constitute a continual invasion of the right of the defendant to maintain the gates . . . . Moreover, the only remedy, other than that of an injunction, for the injury arising from such continued trespass, would be an action against the plaintiff for damages upon each occasion when he left the gates open. The damage in each case would be very small, probably insufficient to defray the expenses of maintaining the action not recoverable as costs. Such remedy is inadequate and would require numerous petty suits, which it is not the policy of the law to encourage." (*Id.* at pp. 232-233.)

Our decision thus noted that injunctive relief was proper, regardless of actual injury, (1) if it is necessary to protect the trespassee's right to control his property, or (2) if suits for damages are impractical, because no individual suit would be worthwhile. Accordingly, we reiterated the rule that " '[a] trespass of a continuing nature, whose constant recurrence renders the remedy at law inadequate, unless by a multiplicity of suits, affords sufficient ground for relief.' " (*Mendelson, supra*, 144 Cal. at p. 233.) Both *Mendelson* grounds support an injunction here.

"Injunction is a proper remedy against threatened repeated acts of trespass . . . particularly where the probable injury resulting therefrom will be

'beyond any method of pecuniary estimation,' and for this reason irreparable."[5] (*Uptown Enterprises v. Strand* (1961) 195 Cal.App.2d 45, 52 [15 Cal.Rptr. 486]; see also *ibid.* [an otherwise lawful "entry for the purpose of harassing the owner, giving his business a bad reputation . . . or unjustifiably interfering with the business relations between him and his patrons is unauthorized, wrongful and actionable"].) Although *Mendelson* and *Uptown Enterprises* concerned real property, the principles of safeguarding a party's possessory interest in property and of not encouraging repetitive litigation apply no less to trespasses to chattels. Accordingly, several courts have issued injunctive relief to prevent interference with personal property.

In 1996, the Appellate Division of the New York Supreme Court considered the claim of plaintiff Tillman, who sought to enjoin the unwanted delivery of a newspaper onto his property. (*Tillman, supra,* 648 N.Y.S.2d 630.) He offered no specific critique of the newspaper's content, observing only " '[t]here is no reason that we have to clean up [defendant's] mess.' " (*Id.* at p. 632.) Citing *Rowan, Martin,* and *Lloyd,* the court rejected the defendants' argument "that there is nothing a homeowner can do to stop the dumping on his or her property of pamphlets or newspapers, no matter how offensive they might be," and instead upheld Tillman's right to prevent the mail's delivery, regardless of whether his objection was due to the quantity (volume) or quality (content) of the messages. (*Tillman,* at p. 636.) In authorizing injunctive relief, the *Tillman* court found no need to quantify the actual damage created by the delivery; it merely noted that the homeowner should not be forced either "to allow such unwanted newspapers to accumulate, or to expend the time and energy necessary to gather and to dispose of them." (*Ibid.*) Subsequent courts have extended this policy to the delivery of e-mail as well.

The *CompuServe* court followed *Tillman* in authorizing an injunction to prevent the delivery of unwanted e-mail messages. (*CompuServe, supra,* 962 F.Supp. 1015.) The majority summarily distinguishes *CompuServe* and its progeny by noting there the "plaintiff showed, or was prepared to show, some interference with the efficient functioning of its computer system." (Maj. opn., *ante,* at p. 1354.) But although *CompuServe* did note the impairment imposed by the defendant's unsolicited e-mail, this was not part of its

---

[5]The majority asserts Intel was not deprived of its computers "for any measurable length of time" (maj. opn., *ante,* at p. 1353), which supposedly fits this case within the rule that a " 'mere momentary or theoretical' " deprivation is insufficient to establish a trespass to chattel (maj. opn., *ante,* at p. 1357). There is a chasm between the two descriptions. The time needed to identify and delete 200,000 e-mail messages is not capable of precise estimation, but it is hardly theoretical or momentary. Most people have no idea of how many words they spoke yesterday, but that does not render the figure de minimis.

holding. Just before beginning its analysis, the court summarized its ruling without mentioning impairment. "[T]his Court holds that where defendants engaged in a course of conduct of transmitting a substantial volume of electronic data in the form of unsolicited e-mail to plaintiff's proprietary computer equipment, where defendants continued such practice after repeated demands to cease and desist, and where defendants deliberately evaded plaintiff's affirmative efforts to protect its computer equipment from such use, plaintiff has a viable claim for trespass to personal property and is entitled to injunctive relief to protect its property." (*CompuServe, supra*, 962 F.Supp. at p. 1017.) The cited criteria apply fully to Hamidi's conduct. Likewise, the conclusion of *CompuServe*'s analysis fully applies here: "Defendants' intentional use of plaintiff's proprietary computer equipment exceeds plaintiff's consent and, indeed, continued after repeated demands that defendants cease. Such use is an actionable trespass to plaintiff's chattel." (*Id.* at p. 1027.)

Post-*CompuServe* case law has emphasized that unauthorized use of another's property establishes a trespass, even without a showing of physical damage. "Although eBay appears unlikely to be able to show a substantial interference at this time, such a showing is not required. Conduct that does not amount to a substantial interference with possession, but which consists of intermeddling with or use of another's personal property, is sufficient to establish a cause of action for trespass to chattel." (*eBay, Inc. v. Bidder's Edge, Inc.* (N.D.Cal. 2000) 100 F.Supp.2d 1058, 1070.)[6] "While the *eBay* decision could be read to require an interference that was more than negligible, . . . this Court concludes that *eBay*, in fact, imposes no such requirement. Ultimately, the court in that case concluded that the defendant's conduct was sufficient to establish a cause of action for trespass not because the interference was 'substantial' but simply because the defendant's conduct amounted to 'use' of Plaintiff's computer." (*Oyster Software, Inc. v. Forms Processing, Inc.* (N.D.Cal., Dec. 6, 2001, No. C-00-0724 JCS) 2001 WL1736382 at *13.) An intruder is not entitled to sleep in his neighbor's car, even if he does not chip the paint.

Hamidi concedes Intel's legal entitlement to block the unwanted messages. The problem is that although Intel has resorted to the cyberspace version of reasonable force, it has so far been unsuccessful in determining how to resist the unwanted use of its system. Thus, while Intel has the legal

---

[6]The majority asserts *eBay* does require impairment, because the opinion noted that the *wide replication* of the defendant's conduct would *likely* impair the functioning of the plaintiff's system. (Maj. opn., *ante*, at pp. 1354-1355.) Of course, the "wide replication" of Hamidi's conduct would likely impair Intel's operating system. Accordingly, a diluted "likely impairment through wide replication" standard would favor Intel, not Hamidi.

right to exclude Hamidi from its system, it does not have the physical ability. It *may* forbid Hamidi's use, but it *cannot* prevent it.

To the majority, Hamidi's ability to outwit Intel's cyber defenses justifies denial of Intel's claim to exclusive use of its property. Under this reasoning, it is not right but might that determines the extent of a party's possessory interest. Although the world often works this way, the legal system should not.

### Intel Suffered Injury

Even if *CompuServe* and its progeny deem injury a prerequisite for injunctive relief, such injury occurred here. Intel suffered not merely an affront to its dignitary interest in ownership but tangible economic loss. Furthermore, notwithstanding the majority's doubts, it is entirely consistent with the Restatement and case law to recognize a property interest in the subjective utility of one's property. Finally, case law further recognizes as actionable the loss that occurs when one party maintains property for its own use and another party uses it, even if the property does not suffer damage as a result.

### Intel suffered economic loss

Courts have recognized the tangible costs imposed by the receipt of unsolicited bulk e-mail (UBE).[7] Approximately 10 percent of the cost of Internet access arises from the delivery of UBE, because networks must expand to ensure their functioning will not be disturbed by the unwanted messages and must design software to reduce the flood of spam. (Whang, *supra*, 37 San Diego L.Rev. at pp. 1203 & fn. 10, 1207 & fn. 37.) Especially where bulk e-mailers mask the true content of their messages in the "header" (as Hamidi did), there is a shift in costs from sender to recipient that resembles " 'sending junk mail with postage due or making telemarketing calls to someone's pay-per-minute cellular phone.' " (*Ferguson v. Friendfinders, Inc.* (2002) 94 Cal.App.4th 1255, 1268 [115 Cal.Rptr.2d 258] (*Ferguson*), quoting *State v. Heckel* (2001) 143 Wash.2d 824 [24 P.3d 404, 98 A.L.R.5th 703] (*Heckel*).) E-mail may be cheaper and more efficient than

---

[7]There is considerable debate regarding whether "spam" encompasses only unsolicited commercial e-mail (UCE) or all UBE, regardless of its commercial nature. (Sorkin, *supra*, 35 U.S.F. L.Rev. at pp. 333-335.) Because parties object to spam due to its volume rather than the sender's motivation, UBE is a preferable definition. (*Id.* at p. 335.) Moreover, as our decision in *Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939 [119 Cal.Rptr.2d 296, 45 P.3d 243] made plain, there is no bright-line distinction between commercial and noncommercial speech. (See also *City of Cincinnati v. Discovery Network, Inc.* (1993) 507 U.S. 410, 419 [113 S.Ct. 1505, 1511, 123 L.Ed.2d 99].)

other means of communication, but "[t]here is no constitutional requirement that the incremental cost of sending massive quantities of unsolicited [messages] must be borne by the recipients." (*CompuServe, supra,* 962 F.Supp. at p. 1026.)

The *Ferguson* court noted the tangible economic loss to employers created by unwanted e-mail. "Individuals who receive UCE can experience increased Internet access fees because of the time required to sort, read, discard, and attempt to prevent future sending of UCE. If the individual undertakes this process at work, *his or her employer suffers the financial consequences of the wasted time.*" (*Ferguson, supra,* 94 Cal.App.4th at p. 1267, italics added.) *CompuServe* likewise observed the recipient of unwanted e-mail must "sift through, *at his expense,* all of the messages in order to find the ones he wanted or expected to receive." (*CompuServe, supra,* 962 F.Supp. at p. 1023, italics added.) Unwanted messages also drain the equipment's processing power, and slow down the transfers of electronic data. (*Id.* at pp. 1022, 1028.)

The economic costs of unwanted e-mail exist even if Intel employees, unlike CompuServe subscribers, do not pay directly for the time they spend on the Internet. No such *direct* costs appear here, only the opportunity costs of lost time. But for Intel, "time is money" nonetheless. One justification for the strict rule against unsolicited faxes is that they "shift[] costs to the recipients who are forced to contribute ink, paper, wear on their fax machines, *as well as personnel time.*" (*Blast Fax, supra,* 323 F.3d at p. 652, italics added.) (*In re Johnny M.* (2002) 100 Cal.App.4th 1128 [123 Cal.Rptr.2d 316] [vandalism that diverted salaried employees from ordinary duties caused economic loss through lost work product].)

Courts have also recognized the harm produced by unwanted paper mail. Mail sent in violation of a request to stop creates the *"burdens* of scrutinizing the mail for objectionable material and possible harassment." (*Rowan, supra,* 397 U.S. at p. 735 [90 S.Ct. at p. 1489], italics added.) The *Tillman* court thus held a newspaper could not compel unwilling recipients *"to spend their own time or money* unwillingly participating in the distribution process by which a newspaper travels from the printing press to its ultimate destination, i.e., disposal." (*Tillman, supra,* 648 N.Y.S.2d at p. 636, italics added.)[8]

Although Hamidi claims he sent only six e-mails, he sent them to between 8,000 and 35,000 employees, thus sending from 48,000 to 210,000 messages. Since it is the effect on Intel that is determinative, it is the number of

---

[8]Citing to *Bolger, supra,* 463 U.S. at page 72 [103 S.Ct. at page 2883], for the proposition that the Constitution imposes on recipients the burden of disposing of unwanted mail, is inapposite because, as explained in part I, *ante, Bolger* involved the *government's* objections to the delivery, not the objection of a nongovernmental actor like Intel, which, under *Rowan, supra,* 397 U.S at pages 736-738 [90 S.Ct. at pages 1490-1491], may exclude unwanted mail.

messages received, not sent, that matters. In any event, Hamidi *sent* between 48,000 and 210,000 messages; the "six" refers only to the number of distinct texts Hamidi sent. Even if it takes little time to determine the author of a message and then delete it, this process, multiplied hundreds of thousands of times, amounts to a substantial loss of employee time, and thus work product. If Intel received 200,000 messages, and each one could be skimmed and deleted in six seconds, it would take approximately 333 hours, or 42 business days, to delete them all. In other words, if Intel hired an employee to remove all unwanted mail, it would take that individual two entire months to finish. (Cf. *Tubbs v. Delk* (Mo.Ct.App. 1996) 932 S.W.2d 454, 456 (*Tubbs*) [deprivation of access to chattel for " 'less than five minutes' " constitutes actionable trespass, although found justified there].)

### *Intel's injury is properly related to the chattel*

The majority does not dispute that Intel suffered a loss of work product as a matter of fact, so much as it denies that this loss may constitute the requisite injury as a matter of law. According to the majority, the reduced utility of the chattel to the owner does not constitute a sufficiently cognizable injury, which exists only where the chattel itself suffers injury, i.e., its "market value" falls. The Restatement and related case law are to the contrary.

The Restatement recognizes that the measure of impairment may be subjective; a cognizable injury may occur not only when the trespass reduces the chattel's market value but also when the trespass affects its value to the owner. "In the great majority of cases, the actor's intermeddling with the chattel impairs the value of it to the possessor, as distinguished from the mere affront to his dignity as possessor, only by some impairment of the physical condition of the chattel. There may, however, be situations in which the *value to the owner* of a particular type of chattel may be impaired by dealing with it in a manner that does not affect its physical condition." (Rest.2d Torts, § 218, com. h, p. 422, italics added.)

The Restatement goes on to explain that A's using B's toothbrush could extinguish its value to B. The brushing constitutes a trespass by impairing the brush's subjective value to the owner rather than its objective market value. (Rest.2d Torts, § 218, com. h, p. 422.) Moreover, there can be a trespass even though the chattel is used as intended—to brush teeth—if it is used by an unwanted party.

As the Court of Appeal's opinion below indicated, interference with an owner's ability to use the chattel supports a trespass. The opinion recalled

the rule, which dates back almost 400 years, holding that chasing an owner's animal amounts to a trespass to chattels. (See, e.g., *Farmer v. Hunt* (1610) 123 Eng.Rep. 766; Winfield & Jolowicz, *supra*, Trespass to Goods, p. 403.) These authorities do not require injury or damage *to the animal*; the interference with the *owner's use of the animal* suffices to create a trespass. (Winfield & Jolowicz, p. 40.) Interference is actionable if it "deprives the possessor of the use of that chattel." (Fleming, The Law of Torts (9th ed. 1998) Trespass, § 4.1, p. 598.) Moreover, such interference need not *permanently deny* the owner the ability to use the chattel—mere *delay* is enough. (See *Tubbs*, *supra*, 932 S.W.2d at p. 456.)

A contemporary version of this interference would occur if a trespasser unplugged the computers of the entire Intel staff and moved them to a high shelf in each employee's office or cubicle. The computers themselves would suffer no damage, but all 35,000 employees would need to take the time to retrieve their computers and restart them. This would reduce the computers' utility to Intel, for, like the chased animals, they would not be available for immediate use. If the chasing of a few animals supports a trespass, then so does even minimal interference with a system used by 35,000 individuals.

*CompuServe* is in accord, as it observed how a bundle of unwanted messages decreased the utility of the server. (*CompuServe*, *supra*, 962 F.Supp. at p. 1023.) Here, Intel maintains a possessory interest in the efficient and productive use of its system—which it spends millions of dollars to acquire and maintain. Hamidi's conduct has impaired the system's optimal functioning for Intel's business purposes. As the Restatement supports liability where "harm is caused to some . . . thing in which the possessor has a legally protected interest" (Rest.2d Torts, § 218, subd. (d)), Hamidi has trespassed upon Intel's chattel.

*The unlawful use of another's property is a trespass, regardless of its effect on the property's utility to the owner*

Finally, even if Hamidi's interference did not affect the server's utility to Intel, it would still amount to a trespass. Intel has poured millions of dollars into a resource that Hamidi has now appropriated for his own use. As noted above, "the appropriation of another's property to one's own use, even for a temporary purpose, constitute[s] [a] trespass[]." (Speiser, *supra*, § 23:23, p. 667, fn. omitted.) The use by one party of property whose costs have been paid by another amounts to an unlawful taking of those resources—even if there is no unjust enrichment by the trespassing party.

In *Buchanan Marine Inc. v. McCormack Sand Co.* (E.D.N.Y. 1990) 743 F.Supp. 139 (*Buchanan*), the plaintiff built and maintained mooring buoys

for use by its own tugboats. The defendants' barges used the buoy over the plaintiff's objection. (*Id.* at pp. 140-141.) The federal district court found such unlawful use could constitute a trespass to chattels (if the facts were proved), and thus denied the defendants' motion for summary judgment. "[D]efendants' meddling with [the buoy] is either a trespass to a chattel or perhaps a conversion for which [the plaintiff] may seek relief in the form of damages and an injunction." (*Id.* at pp. 141-142.) There was an allegation of damage (to the plaintiff's barge, not the buoy itself), which could support a claim for damages, but this was not a prerequisite for injunctive relief. Even if the defendants did not injure the buoys in any way, they still had no right to expropriate the plaintiff's property for their own advantage.

The instant case involves a similar taking. Intel has paid for thousands of computers, as well as the costs of maintaining a server.[9] Like the *Buchanan* defendants, Hamidi has likewise acted as a free rider in enjoying the use of not only Intel's computer system but the extra storage capacity needed to accommodate his messages. Furthermore, Intel's claim, which does not object to Hamidi's speaking independently,[10] only to his use of Intel's property, resembles that of the *Buchanan* plaintiff who "has not sought to prevent others from placing their own mooring buoys in the Harbor," but only the use of the plaintiff's property.[11] (*Buchanan, supra,* 743 F.Supp. at p. 142.) Hamidi has thus unlawfully shifted the costs of his speaking to Intel. (*Ferguson, supra,* 94 Cal.App.4th at p. 1268; *Blast Fax, supra,* 323 F.3d at p. 652; *Heckel, supra,* 24 P.3d at p. 410.)

Moreover, even such free ridership is not necessary to establish a trespass to chattels. Had the *Thrifty-Tel* defendants succeeded in making free telephone calls without authorization, they would stand in the same position as the *Buchanan* defendants. But the record does not show they ever succeeded in making calls for which another subscriber (or the phone company itself) would have to pay. *Thus, neither injury to the trespassee nor benefit to the*

---

[9]In fact, Intel pays to maintain a high capacity to ensure that the system does not crash (or slow down); if Intel had not preempted such harm, there is no dispute that Hamidi would be liable for damages. As Professor Epstein cogently observes, Intel is thus being penalized for engaging in preemptive self-help. According to the majority, Intel would do better by saving its money and collecting damages after a crash/slowdown.

[10]Intel does not object to Hamidi's transmitting the same message through his Web site, e-mail to employees' home computers, snail mail to their homes, distribution of materials from outside the company's gates, or any other communication that does not conscript Intel's property into Hamidi's service. Intel does object to the use of its property, regardless of its message. Although Intel objected that Hamidi sent antagonistic messages, Intel would presumably also object if Hamidi sent "blank" messages that slowed down both the Intel system and the employees who use it.

[11]As with the hypothetical toothbrush, the *Buchanan* defendants used the buoy for its intended use. (*Buchanan, supra,* 743 F.Supp. at p. 140.)

*trespasser is an element of trespass to chattel.* "[T]respass to chattel has evolved considerably from its original common law application—concerning the asportation of another's tangible property—to include even the unauthorized *use* of personal property." (*Thrifty-Tel, supra,* 46 Cal.App.4th at p. 1566.)

As in those cases in which courts have granted injunctions to prevent the delivery of unwanted mail, paper or electronic, Intel is not attempting to *profit* from its trespass action by receiving nominal damages. Rather, it seeks an injunction to *prevent* further trespass. Moreover, Intel suffered the requisite injury by losing a great deal of work product, a harm properly related to the property itself, as well as the money it spent in maintaining the system, which Hamidi wrongfully expropriated.

## CONCLUSION

Those who have contempt for grubby commerce and reverence for the rarified heights of intellectual discourse may applaud today's decision, but even the flow of ideas will be curtailed if the right to exclude is denied. As the Napster controversy revealed, creative individuals will be less inclined to develop intellectual property if they cannot limit the terms of its transmission. Similarly, if online newspapers cannot charge for access, they will be unable to pay the journalists and editorialists who generate ideas for public consumption.

This connection between the property right to objects and the property right to ideas and speech is not novel. James Madison observed, "a man's land, or merchandize, or money is called his property." (Madison, *Property,* Nat. Gazette (Mar. 27, 1792), reprinted in The Papers of James Madison (Rutland et al. edits., 1983) p. 266, quoted in McGinnis, *The Once and Future Property-Based Vision of the First Amendment* (1996) 63 U. Chi. L.Rev. 49, 65.) Likewise, "a man has a property in his opinions and the free communication of them." (*Ibid.*) Accordingly, "freedom of speech and property rights were seen simply as different aspects of an indivisible concept of liberty." (*Id.* at p. 63.)

The principles of both personal liberty and social utility should counsel us to usher the common law of property into the digital age.

**MOSK, J.,**\* Dissenting.—The majority hold that the California tort of trespass to chattels does not encompass the use of expressly unwanted

---

\*Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

electronic mail that causes no physical damage or impairment to the recipient's computer system. They also conclude that because a computer system is not like real property, the rules of trespass to real property are also inapplicable to the circumstances in this case. Finally, they suggest that an injunction to preclude mass, noncommercial, unwelcome e-mails may offend the interests of free communication.

I respectfully disagree and would affirm the trial court's decision. In my view, the repeated transmission of bulk e-mails by appellant Kourosh Kenneth Hamidi (Hamidi) to the employees of Intel Corporation (Intel) on its proprietary confidential e-mail lists, despite Intel's demand that he cease such activities, constituted an actionable trespass to chattels. The majority fail to distinguish open communication in the public "commons" of the Internet from unauthorized intermeddling on a private, proprietary intranet. Hamidi is not communicating in the equivalent of a town square or of an unsolicited "junk" mailing through the United States Postal Service. His action, in crossing from the public Internet into a private intranet, is more like intruding into a private office mailroom, commandeering the mail cart, and dropping off unwanted broadsides on 30,000 desks. Because Intel's security measures have been circumvented by Hamidi, the majority leave Intel, which has exercised all reasonable self-help efforts, with no recourse unless he causes a malfunction or systems "crash." Hamidi's repeated intrusions did more than merely "prompt[] discussions between '[e]xcited and nervous managers' and the company's human resources department" (maj. opn., *ante*, at p. 1349); they also constituted a misappropriation of Intel's private computer system contrary to its intended use and against Intel's wishes.

The law of trespass to chattels has not universally been limited to physical damage. I believe it is entirely consistent to apply that legal theory to these circumstances—that is, when a proprietary computer system is being used contrary to its owner's purposes and expressed desires, and self-help has been ineffective. Intel correctly expects protection from an intruder who misuses its proprietary system, its nonpublic directories, and its supposedly controlled connection to the Internet to achieve his bulk mailing objectives—incidentally, without even having to pay postage.

I

Intel maintains an intranet—a proprietary computer network—as a tool for transacting and managing its business, both internally and for external

business communications.[1] The network and its servers constitute a tangible entity that has value in terms of the costs of its components and its function in enabling and enhancing the productivity and efficiency of Intel's business operations. Intel has established costly security measures to protect the integrity of its system, including policies about use, proprietary internal e-mail addresses that it does not release to the public for use outside of company business, and a gateway for blocking unwanted electronic mail—a so-called firewall.

The Intel computer usage guidelines, which are promulgated for its employees, state that the computer system is to be "used as a resource in conducting business. Reasonable personal use is permitted, but employees are reminded that these resources are the property of Intel and all information on these resources is also the property of Intel." Examples of personal use that would not be considered reasonable expressly include "use that adversely affects productivity." Employee e-mail communications are neither private nor confidential.

Hamidi, a former Intel employee who had sued Intel and created an organization to disseminate negative information about its employment practices, sent bulk electronic mail on six occasions to as many as 35,000 Intel employees on its proprietary computer system, using Intel's confidential employee e-mail lists and adopting a series of different origination addresses and encoding strategies to elude Intel's blocking efforts. He refused to stop when requested by Intel to do so, asserting that he would ignore its demands: "I don't care. I have grown deaf." Intel sought injunctive relief, alleging that the disruptive effect of the bulk electronic mail, including expenses from administrative and management personnel, damaged its interest in the proprietary nature of its network.

The trial court, in its order granting summary judgment and a permanent injunction, made the following pertinent findings regarding Hamidi's transmission of bulk electronic mail: "Intel has requested that Hamidi stop sending the messages, but Hamidi has refused, and has employed surreptitious means to circumvent Intel's efforts to block entry of his messages into

---

[1]The Oxford English Dictionary defines an intranet as "A local or restricted computer network; *spec.* a private or corporate network that uses Internet protocols. An intranet may (but need not) be connected to the Internet and be accessible externally to authorized users." (OED Online, new ed., draft entry, Mar. 2003, <http://dictionary.oed.com/> [as of June 30, 2003]; see also Kokka, *Property Rights on an Intranet*, 3-Spring 1998 J. Tech.L. & Pol'y 3, WL 3 UFLJTLP 3 at *3, *6 [defining an intranet as "an internal network of computers, servers, routers and browser software designed to organize, secure, distribute and collect information within an organization," which in large organizations generally includes a wide range of services, including e-mail].) Contrary to the majority's assertion, there is nothing incorrect about characterizing Hamidi's unauthorized bulk e-mails as intrusions onto Intel's intranet.

Intel's system. . . . [¶] . . . The e-mail system is dedicated for use in conducting business, including communications between Intel employees and its customers and vendors. Employee e-mail addresses are not published for use outside company business. . . . [¶] The intrusion by Hamidi into the Intel e-mail system has resulted in the expenditure of company resources to seek to block his mailings and to address employee concerns about the mailings. Given Hamidi's evasive techniques to avoid blocking, the self help remedy available to Intel is ineffective." The trial court concluded that "the evidence establishes (without dispute) that Intel has been injured by diminished employee productivity and in devoting company resources to blocking efforts and to addressing employees about Hamidi's e-mails." The trial court further found that the "massive" intrusions "impaired the value to Intel of its e-mail system."

The majority agree that an impairment of Intel's system would result in an action for trespass to chattels, but find that Intel suffered no injury. As did the trial court, I conclude that the undisputed evidence establishes that Intel was substantially harmed by the costs of efforts to block the messages and diminished employee productivity. Additionally, the injunction did not affect Hamidi's ability to communicate with Intel employees by other means; he apparently continues to maintain a Web site to publicize his messages concerning the company. Furthermore, I believe that the trial court and the Court of Appeal correctly determined that the tort of trespass to chattels applies in these circumstances.

The Restatement Second of Torts explains that a trespass to a chattel occurs if "the chattel is impaired as to its *condition, quality, or value*" or if "harm is caused to some . . . thing in which the possessor has a legally protected interest." (Rest.2d Torts, § 218, subds. (b) & (d), p. 420, italics added.) As to this tort, a current prominent treatise on the law of torts explains that "[t]he defendant may interfere with the chattel by interfering with the plaintiff's access or use" and observes that the tort has been applied so as "to protect computer systems from electronic invasions by way of unsolicited email or the like." (1 Dobbs, The Law of Torts (2001) § 60, pp. 122-123.) Moreover, "[t]he harm necessary to trigger liability for trespass to chattels can be . . . harm to something other than the chattel itself." (*Id.*, pp. 124-125; see also 1 Harper et al., The Law of Torts (3d ed. 1996 & 2003 supp.) § 2.3, pp. 2:14-2:18.) The Restatement points out that, unlike a possessor of land, a possessor of a chattel is not given legal protection from harmless invasion, but the "actor" may be liable if the conduct affects "some other and more important *interest* of the possessor." (Rest.2d Torts, § 218, com. e, p. 421, italics added.)

The Restatement explains that the rationale for requiring harm for trespass to a chattel but not for trespass to land is the availability and effectiveness of

self-help in the case of trespass to a chattel. "Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference." (Rest.2d Torts, § 218, com. e, p. 422.) Obviously, "force" is not available to prevent electronic trespasses. As shown by Intel's inability to prevent Hamidi's intrusions, self-help is not an adequate alternative to injunctive relief.

The common law tort of trespass to chattels does not require physical disruption to the chattel. It also may apply when there is impairment to the "quality" or "value" of the chattel. (Rest.2d Torts, § 218, subd. b, p. 420; see also id., com. e, pp. 421-422 [liability if "intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel"].) Moreover, as we held in *Zaslow v. Kroenert* (1946) 29 Cal.2d 541, 551 [176 P.2d 1], it also applies "[w]here the conduct complained of does not amount to a substantial interference with possession or the right thereto, but consists of intermeddling with or use of or damages to the personal property."[2]

Here, Hamidi's deliberate and continued intermeddling, and threatened intermeddling, with Intel's proprietary computer system for his own purposes that were hostile to Intel, certainly impaired the quality and value of the system as an internal business device for Intel and forced Intel to incur costs to try to maintain the security and integrity of its server—efforts that proved ineffective. These included costs incurred to mitigate injuries that had already occurred. It is not a matter of "bootstrapp[ing]" (maj. opn., *ante*, at p. 1359) to consider those costs a damage to Intel. Indeed, part of the value of the proprietary computer system is the ability to exclude intermeddlers from entering it for significant uses that are disruptive to its owner's business operations.

If Intel, a large business with thousands of former employees, is unable to prevent Hamidi from continued intermeddling, it is not unlikely that other outsiders who obtain access to its proprietary electronic mail addresses would engage in similar conduct, further reducing the value of, and perhaps debilitating, the computer system as a business productivity mechanism. Employees understand that a firewall is in place and expect that the messages they receive are from senders permitted by the corporation. Violation

---

[2] In *Zaslow*, we observed that when the trespass involves "intermeddling with or use of" another's property, the owner "may recover only the actual damages suffered by reason of the impairment of the property or the loss of its use." (*Zaslow v. Kroenert, supra,* 29 Cal.2d at p. 551.) We did not state that such damages were a requirement for a cause of action; nor did we address the availability of injunctive relief.

of this expectation increases the internal disruption caused by messages that circumvent the company's attempt to exclude them. The time that each employee must spend to evaluate, delete or respond to the message, when added up, constitutes an amount of compensated time that translates to quantifiable financial damage.[3]

All of these costs to protect the integrity of the computer system and to deal with the disruptive effects of the transmissions and the expenditures attributable to employee time constitute damages sufficient to establish the existence of a trespass to chattels, even if the computer system was not overburdened to the point of a "crash" by the bulk electronic mail.

The several courts that have applied the tort of trespass to chattels to deliberate intermeddling with proprietary computer systems have, for the most part, used a similar analysis. Thus, the court in *CompuServe Inc. v. Cyber Promotions, Inc.* (S.D. Ohio 1997) 962 F.Supp. 1015, 1022, applied the Restatement to conclude that mass mailings and evasion of the server's filters diminished the value of the mail processing computer equipment to CompuServe "even though it is not physically damaged by defendants' conduct." The inconvenience to users of the system as a result of the mass messages "decrease[d] the utility of CompuServe's e-mail service" and was actionable as a trespass to chattels. (*Id.* at p. 1023.)

The court in *America Online, Inc. v. IMS* (E.D.Va. 1998) 24 F.Supp.2d 548, on facts similar to those in the present case, also applied the Restatement in a trespass to chattels claim. There, defendant sent unauthorized e-mails to America Online's computer system, persisting after receiving notice to desist and causing the company "to spend technical resources and

---

[3] As the recent spate of articles on "spam"—unsolicited bulk e-mail—suggests, the effects on business of such unwanted intrusions are not trivial. "Spam is not just a nuisance. It absorbs bandwidth and overwhelms Internet service providers. Corporate tech staffs labor to deploy filtering technology to protect their networks. The cost is now widely estimated (though all such estimates are largely guesswork) at billions of dollars a year. The social costs are immeasurable. . . . [¶] 'Spam has become the organized crime of the Internet.' . . . '[M]ore and more it's becoming a systems and engineering and networking problem.'" (Gleick, *Tangled Up in Spam*, N.Y. Times (Feb. 9, 2003) magazine p. 1 <http://www.nytimes.com/2003/02/09/> [as of June 30, 2003]; see also Cooper & Shogren, *U.S., States Turn Focus to Curbing Spam*, L.A. Times (May 1, 2003) p. A21, col. 2 ["Businesses are losing money with every moment that employees spend deleting"]; Turley, *Congress Must Send Spammers a Message*, L.A. Times (Apr. 21, 2003) p. B13, col. 5 ["Spam now costs American businesses about $9 billion a year in lost productivity and screening"]; Taylor, *Spam's Big Bang!* (June 16, 2003) Time, p. 51 ["The time we spend deleting or defeating spam costs an estimated $8.9 billion a year in lost productivity"].) But the occasional spam addressed to particular employees does not pose nearly the same threat of impaired value as the concerted bulk mailings into one e-mail system at issue here, which mailings were sent to thousands of employees with the express purpose of disrupting business as usual.

staff time to 'defend' its computer system and its membership" against the unwanted messages. (*Id.* at p. 549.) The company was not required to show that its computer system was overwhelmed or suffered a diminution in performance; mere use of the system by the defendant was sufficient to allow the plaintiff to prevail on the trespass to chattels claim.

Similarly, the court in *eBay, Inc. v. Bidder's Edge, Inc.* (N.D.Cal. 2000) 100 F.Supp.2d 1058 determined that there was a trespass to chattels when the quality or value of a computer system was diminished by unauthorized "web crawlers,"[4] despite the fact that eBay had not alleged any "particular service disruption" (*eBay,* at p. 1065) or "specific incremental damages" (*id.* at p. 1063) to the computer system. Intermeddling with eBay's private property was sufficient to establish a cause of action: "A trespasser is liable when the trespass diminishes the condition, quality or value of personal property"; "[e]ven if [defendant's intrusions] use only a small amount of eBay's computer . . . capacity, [defendant] has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property." (*Id.* at p. 1071; see also, e.g., *Oyster Software, Inc. v. Forms Processing, Inc.* (N.D.Cal., Dec. 6, 2001, No. C-00-0724 JCS) 2001 WL 1736382 at *12 -*13 [trespass to chattels claim did not require company to demonstrate physical damage]; accord, *Register.com, Inc. v. Verio, Inc.* (S.D.N.Y. 2000) 126 F.Supp.2d 238, 250; cf. *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1566-1567 [54 Cal.Rptr.2d 468] [unconsented electronic access to a computer system constituted a trespass to chattels].)

These cases stand for the simple proposition that owners of computer systems, like owners of other private property, have a right to prevent others from using their property against their interests. That principle applies equally in this case. By his repeated intermeddling, Hamidi converted Intel's private employee e-mail system into a tool for harming productivity and disrupting Intel's workplace. Intel attempted to put a stop to Hamidi's intrusions by increasing its electronic screening measures and by requesting that he desist. Only when self-help proved futile, devolving into a potentially endless joust between attempted prevention and circumvention, did Intel request and obtain equitable relief in the form of an injunction to prevent further threatened injury.

The majority suggest that Intel is not entitled to injunctive relief because it chose to allow its employees access to e-mail through the Internet and

---

[4]A "web crawler" is a computer program that operates across the Internet to obtain information from the Web sites of others. (*eBay, Inc. v. Bidder's Edge, Inc., supra,* 100 F.Supp.2d at p. 1061, fn. 2.)

because Hamidi has apparently told employees that he will remove them from his mailing list if they so request. They overlook the proprietary nature of Intel's intranet system; Intel's system is not merely a conduit for messages to its employees. As the owner of the computer system, it is Intel's request that Hamidi stop that must be respected. The fact that, like most large businesses, Intel's intranet includes external e-mail access for essential business purposes does not logically mean, as the majority suggest, that Intel has forfeited the right to determine who has access to its system. Its intranet is not the equivalent of a common carrier or public communications licensee that would be subject to requirements to provide service and access. Just as Intel can, and does, regulate the use of its computer system by its employees, it should be entitled to control its use by outsiders and to seek injunctive relief when self-help fails.

The majority also propose that Intel has sufficient avenues for legal relief outside of trespass to chattels, such as interference with prospective economic relations, interference with contract, intentional infliction of emotional distress, and defamation; Hamidi urges that an action for nuisance is more appropriate. Although other causes of action may under certain circumstances also apply to Hamidi's conduct, the remedy based on trespass to chattels is the most efficient and appropriate. It simply requires Hamidi to stop the unauthorized use of property without regard to the content of the transmissions. Unlike trespass to chattels, the other potential causes of action suggested by the majority and Hamidi would require an evaluation of the transmissions' content and, in the case of a nuisance action, for example, would involve questions of degree and value judgments based on competing interests. (See *Hellman v. La Cumbre Golf & Country Club* (1992) 6 Cal.App.4th 1224, 1230-1231 [8 Cal.Rptr.2d 293]; 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 153, p. 833; Rest.2d Torts, § 840D). ·

## II

As discussed above, I believe that existing legal principles are adequate to support Intel's request for injunctive relief. But even if the injunction in this case amounts to an extension of the traditional tort of trespass to chattels, this is one of those cases in which, as Justice Cardozo suggested, "[t]he creative element in the judicial process finds its opportunity and power" in the development of the law. (Cardozo, Nature of the Judicial Process (1921) p. 165.)[5]

The law has evolved to meet economic, social, and scientific changes in society. The industrial revolution, mass production, and new transportation

---

[5] "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV." (Holmes, *The Path of the Law* (1897) 10 Harv. L.Rev. 457, 469.)

and communication systems all required the adaptation and evolution of legal doctrines.

The age of computer technology and cyberspace poses new challenges to legal principles. As this court has said, "the so-called Internet revolution has spawned a host of new legal issues as courts have struggled to apply traditional legal frameworks to this new communication medium." (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 266 [127 Cal.Rptr.2d 329, 58 P.3d 2].) The court must now grapple with proprietary interests, privacy, and expression arising out of computer-related disputes. Thus, in this case the court is faced with "that balancing of judgment, that testing and sorting of considerations of analogy and logic and utility and fairness" that Justice Cardozo said he had "been trying to describe." (Cardozo, Nature of the Judicial Process, *supra*, pp. 165-166.) Additionally, this is a case in which equitable relief is sought. As Bernard Witkin has written, "equitable relief is *flexible and expanding*, and the theory that 'for every wrong there is a remedy' [Civ. Code, § 3523] may be invoked by equity courts to justify the invention of new methods of relief for new types of wrongs." (11 Witkin, Summary of Cal. Law, *supra*, Equity, § 3, p. 681.) That the Legislature has dealt with some aspects of commercial unsolicited bulk e-mail (Bus. & Prof. Code, §§ 17538.4, 17538.45; see maj. opn., *ante*, at pp. 1363-1364) should not inhibit the application of common law tort principles to deal with e-mail transgressions not covered by the legislation. (Cf. *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297 [65 Cal.Rptr.2d 872, 940 P.2d 323]; *I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].)

Before the computer, a person could not easily cause significant disruption to another's business or personal affairs through methods of communication without significant cost. With the computer, by a mass mailing, one person can at no cost disrupt, damage, and interfere with another's property, business, and personal interests. Here, the law should allow Intel to protect its computer-related property from the unauthorized, harmful, free use by intruders.

### III

As the Court of Appeal observed, connecting one's driveway to the general system of roads does not invite demonstrators to use the property as a public forum. Not mindful of this precept, the majority blur the distinction between public and private computer networks in the interest of "ease and openness of communication." (Maj. opn., *ante*, at p. 1363.) By upholding Intel's right to exercise self-help to restrict Hamidi's bulk e-mails, they

concede that he did not have a right to send them through Intel's proprietary system. Yet they conclude that injunctive relief is unavailable to Intel because it connected its e-mail system to the Internet and thus, "necessarily contemplated" unsolicited communications to its employees. (Maj. opn., *ante*, at p. 1359.) Their exposition promotes unpredictability in a manner that could be as harmful to open communication as it is to property rights. It permits Intel to block Hamidi's e-mails entirely, but offers no recourse if he succeeds in breaking through its security barriers, unless he physically or functionally degrades the system.

By making more concrete damages a requirement for a remedy, the majority have rendered speech interests dependent on the impact of the e-mails. The sender will never know when or if the mass e-mails sent by him (and perhaps others) will use up too much space or cause a crash in the recipient system, so as to fulfill the majority's requirement of damages. Thus, the sender is exposed to the risk of liability because of the possibility of damages. If, as the majority suggest, such a risk will deter "ease and openness of communication" (maj. opn., *ante*, at p. 1363), the majority's formulation does not eliminate such deterrence. Under the majority's position, the lost freedom of communication still exists. In addition, a business could never reliably invest in a private network that can only be kept private by constant vigilance and inventiveness, or by simply shutting off the Internet, thus limiting rather than expanding the flow of information.[6] Moreover, Intel would have less incentive to allow employees reasonable use of its equipment to send and receive personal e-mails if such allowance is justification for preventing restrictions on unwanted intrusions into its computer system. I believe the best approach is to clearly delineate private from public networks and identify as a trespass to chattels the kind of intermeddling involved here.

The views of the amici curiae group of intellectual property professors that a ruling in favor of Intel will interfere with communication are similarly misplaced because here, Intel, contrary to most users, expressly informed Hamidi that it did not want him sending messages through its system. Moreover, as noted above, all of the problems referred to will exist under the apparently accepted law that there is a cause of action if there is some actionable damage.

Hamidi and other amici curiae raise, for the first time on appeal, certain labor law issues, including the matter of protected labor-related communications. Even assuming that these issues are properly before this court (see

---

[6]Thus, the majority's approach creates the perverse incentive for companies to invest less in computer capacity in order to protect their property. In the view of the majority, Hamidi's massive e-mails would be actionable only if Intel had insufficient server or storage capacity to manage them.

Cal. Rules of Court, rule 28(c)(1)), to the extent the laws allow what would otherwise be trespasses for some labor-related communications, my position does not exclude that here too. But there has been no showing that the communications are labor-law protected.[7]

Finally, with regard to alleged constitutional free speech concerns raised by Hamidi and others, this case involves a private entity seeking to enforce private rights against trespass. Unlike the majority, I have concluded that Hamidi did invade Intel's property. His actions constituted a trespass—in this case a trespass to chattels. There is no federal or state constitutional right to trespass. (*Adderley v. Florida* (1966) 385 U.S. 39, 47 [87 S.Ct. 242, 247, 17 L.Ed.2d 149 ] ["Nothing in the Constitution of the United States prevents Florida from even-handed enforcement of its general trespass statute. . . ."]; *Church of Christ in Hollywood v. Superior Court* (2002) 99 Cal.App.4th 1244, 1253-1254 [121 Cal.Rptr.2d 810] [affirming a restraining order preventing former church member from entering church property: "[the United States Supreme Court] has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned"]; see also *CompuServe Inc. v. Cyber Promotions, Inc., supra,* 962 F.Supp. at p. 1026 ["the mere judicial enforcement of neutral trespass laws by the private owner of property does not alone render it a state actor"]; *Cyber Promotions, Inc. v. America Online, Inc.* (E.D.Pa. 1996) 948 F.Supp. 436, 456 ["a private company such as Cyber simply does not have the unfettered right under the First Amendment to invade AOL's private property . . . ."].) Accordingly, the cases cited by the majority regarding restrictions on speech, not trespass, are not applicable. Nor does the connection of Intel's e-mail system to the Internet transform it into a public forum any more than any connection between private and public properties. Moreover, as noted above, Hamidi had adequate alternative means for communicating with Intel employees so that an injunction would not, under any theory, constitute a free speech violation. (*Lloyd Corp. v. Tanner* (1972) 407 U.S. 551, 568-569 [92 S.Ct. 2219, 2228-2229, 33 L.Ed.2d 131].)

IV

The trial court granted an injunction to prevent threatened injury to Intel. That is the purpose of an injunction. (*Ernst & Ernst v. Carlson* (1966) 247 Cal.App.2d 125, 128 [55 Cal.Rptr. 626].) Intel should not be helpless in the face of repeated and threatened abuse and contamination of its private computer system. The undisputed facts, in my view, rendered Hamidi's

---

[7]The bulk e-mail messages from Hamidi, a nonemployee, did not purport to spur employees into any collective action; he has conceded that "[t]his is not a drive to unionize." Nor was his disruptive conduct part of any bona fide labor dispute.

conduct legally actionable. Thus, the trial court's decision to grant a permanent injunction was not "a clear abuse of discretion" that may be "disturbed on appeal." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631]; see also *City of Vernon v. Central Basin Mun. Water Dist.* (1999) 69 Cal.App.4th 508, 516 [81 Cal.Rptr.2d 650] [in an appeal of summary judgment, the trial court's decision to deny a permanent injunction was "governed by the abuse of discretion standard of review"].)

The injunction issued by the trial court simply required Hamidi to refrain from further trespassory conduct, drawing no distinction based on the content of his e-mails. Hamidi remains free to communicate with Intel employees and others outside the walls—both physical and electronic—of the company.

For these reasons, I respectfully dissent.

George, C. J., concurred.